**UNITED STATES of America,**
**Plaintiff,**

v.

**Joseph M. DONLON, Defendant.**
**Crim. A. No. 1694.**

United States District Court
D. Delaware.
July 14, 1966.

Alfred J. Lindh, Asst. U. S. Atty., Wilmingon, Del., for plaintiff.

Emmett J. Conte, Jr., Wilmington, Del., for defendant.

LAYTON, District Judge.

Defendant, Joseph M. Donlon, has been tried by a jury upon an indictment in three counts, charging him with violation of the Federal Wagering Tax laws, 26 U.S.C., Sections 7201 and 7203. Count I charged the defendant with wilfully attempting to evade and defeat the excise tax upon wagers accepted by him in the month of June, 1964. Count II charged the defendant with wilfully attempting to evade and defeat the special occupational tax imposed upon him by reason of his having engaged in the business of accepting wagers during June, 1964. Count III charged the defendant with wilfully failing to register with, and furnish information to, the District Director of Internal Revenue, as required by reason of his having engaged in the business of accepting wagers during June, 1964.

The jury found defendant guilty on all three counts on May 27, 1965. Thereafter, defendant filed this motion for a judgment of acquittal, or, in the alternative, for a new trial. In support of the motion, defendant set forth six grounds in its brief; a seventh ground was urged at oral argument.

The underlying facts of the case are as follows.

During May and June, 1964, defendant Donlon was placed under surveillance by Agents of the Intelligence Division, Internal Revenue Service. Defendant was observed to follow a routine which included a series of visits to various locations in and around the City of Wilmington during the morning, a short stop at his own store, Don's Gift Shop, and a return to his home. In the afternoons, he would return to his own store, which remained closed during the time he was away. In the course of this routine, he was observed to have conducted a series of transactions with other persons involving slips of paper or money or both.[1]

On June 1, 1964, an employee of the Audit Division of the Internal Revenue Service visited defendant and explained in some detail the requirements of the Federal Wagering law, including stamp purchase, registration requirements, and the 10% excise tax on wagers. Defendant acknowledged the explanation. Defendant neither purchased the stamp, registered, nor paid the required excise tax on gross wagers.

On Friday, June 19, 1964, pursuant to search warrants issued for that purpose, a group of Federal Agents conducted a search of defendant's house. They found three pieces of paper with names and columns of numbers in a specially constructed shelf containing a secret hiding place. They also found a slip of paper with names and columns of numbers under the cushion of defendant's chair. The United States takes the position that these sheets of paper represented the records of defendant's wagering business during the period of June 13 to June 19, 1964, disclosing an operation involving approximately sixty numbers writers employed by defendant.

Defendant was then arrested, pursuant to a warrant, and searched. He was found to have $5,875.00 in cash on his person. He stated that the currency was his, and said that $333.00, taken from one particular pocket, was proceeds from his store, Don's Gift Shop. When questioned about the remainder of the money, he asserted his Fifth Amendment rights. He denied being in the business of accepting wagers. He denied knowledge of the hiding place in the shelf, of the papers it contained, or of the sheet of paper under the cushion of his chair. He also invoked the Fifth Amendment when questioned further, as, for instance, whether his handwriting matched the writing on the papers.

---

1. As will be noted later, an objection by the defense limited government testimony on this surveillance to that surveillance conducted during the month of June, 1964, since the indictment had been limited to that month.

## I.

Defendant argues that evidence of statements made by him at the time of his arrest should not have been admitted since he had not been warned of his right to counsel, under Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); and United States v. New Jersey ex rel. Russo, 351 F.2d 429 (C.A.3, 1965). However, under a recent United States Supreme Court decision, Johnson and Cassidy v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (June 20, 1966), the requirement that Government Agents or police effectively warn suspects in custody of their right to counsel, set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (June 13, 1966), was held to be prospective only and not to apply to cases involving trials beginning before June 13, 1966. The holding of the Third Circuit in *Russo*, supra, was accordingly vacated (384 U.S. 889, 86 S.Ct. 1914, 16 L.Ed.2d 995, June 20, 1966), because the *Russo* decision required an affirmative warning of right to counsel for suspects in custody prior to the date of June 13, 1966.

Statements made by defendant Donlon were admissible under the guidelines of *Escobedo*, supra, since his trial ended on May 27, 1965. Defendant did not request counsel. He was not refused counsel. At his arrest, he was warned of his Constitutional right to remain silent. The evidence showed that he actually exercised that right on a number of occasions. Further, the statements of defendant which were put into evidence were exculpatory in nature. Two competent defense counsel did not object to the admission of the statements. The Court itself raised the *Escobedo* question, and defense counsel still declined to object, undoubtedly for tactical reasons. Since counsel purposely refused to object to the admission of defendant's exculpatory statements, efforts to raise this issue by way of post-trial motion are not persuasive. United States v. Bando,

244 F.2d 833, 845–846 (C.A.2, 1957); United States v. Lutz, 142 F.2d 985 (C.A. 3, 1944).

## II.

Defendant contends that there was no evidence of defendant's acceptance of a wager, and that without such evidence, the action should have been dismissed at the close of the Government's case, citing United States v. Calamaro, 354 U.S. 351, 77 S.Ct. 1138, 1 L.Ed.2d 1394 (1957), affirming 236 F.2d 182 (C.A.3, 1956). The *Calamaro* case involved a defendant who merely picked up records of wagers, rather than "accepting" the wagers, including the risk of winning or losing. The Government apparently conceded that the defendant Calamaro was only a "pick-up man."

In the instant case, there was considerable evidence from which a jury could find that defendant Donlon was accepting wagers, including the risk of winning or losing. Such evidence included defendant's possession of weekly and daily records; expert testimony to the effect that these records listed sixty writers and the proceeds of their respective wagers; defendant's unexplained possession of a large quantity of currency; and surveillance testimony of defendant's daily routine. From all this evidence, a jury could have believed that defendant Donlon had accepted hundreds of wagers, as opposed to the mere receipt of wagering records shown in the *Calamaro* case.

## III.

Defendant attacks the sufficiency of the Government's evidence that defendant Donlon wilfully violated the Federal Wagering Tax laws, apparently on the basis of statements made by Donlon at the time of his arrest that he did not understand the law.

However, the Government presented Agent Iannelli, who testified that on June 1, 1964, the first day of the month covering the time included in the indictment, he explained the Federal Wagering Tax laws to defendant in some detail, and that defendant stated that he under-

stood the law. The evidence of wilfulness was more than sufficient; it was compelling.

### IV.

■ Defendant urges that the Court erred in overruling defense objections to testimony by Government witnesses involving attempts to identify code names appearing on defendant's wagering records.

Lt. Bullen, of the Delaware State Police, and Detective Sergeant Coen, of the Wilmington police, testified as experts on two phases of gambling activities in and around Wilmington. Their expertise in this area[2] was not challenged by the defense.

The witnesses were asked, "As a result of your length of service as a detective with the Delaware State (Wilmington) Police, and in particular as a member of the vice squad investigating gambling, were you familiar with the names of persons who were engaged in wagering activities, such as the numbers game, during June of 1964?" After an affirmative answer to the above question, both witnesses were handed the sheets of paper found in the search of defendant's house,[3] and were asked the following questions: "Do any of those names, those names consisting of nicknames and first names, represent people whom you know to have been engaged in wagering activities in and about Wilmington in June of 1964?"

The above questions were framed in this manner as a result of a series of defendant's objections as to form, which were sustained on several previous questions. A number of objections based on the alleged speculative and prejudicial nature of the answers to the questions were overruled, and the testimony allowed. However, the Court carefully instructed the jury at that point that the weight of such evidence was a matter of degree, and was for the jury to decide. Then, in the Court's charge, the jury was instructed to disregard that portion of the expert testimony which stated that the named individuals were engaged in gambling operations specifically during the month of June, 1964.[4] The Court explicitly retained testimony that " * * * in his (Bullen and Coen) judgment as an expert some of these (names) were associated with gambling activities."

Defendant's position is that this testimony was highly speculative, and that its probative value was outweighed by its tendency to prejudice defendant unduly. However, since defendant did not press an earlier request for a voir dire examination of the witnesses, in or out of the hearing of the jury, to determine either the extent of their expertise, or the knowledge and reasons underlying their conclusions, defendant's charge of pure speculation stands unsupported in the record.

The identifications made by the witnesses are corroborated in a number of ways, throughout the record, so that the probative weight of the identifications overbalance any tendency to prejudice the defendant.

A study of the list of names demonstrated that while there are a large number of more common names, or such code names as "#1", "#2", "X", "LB", or "El", the identifications were primarily directed to the relatively unusual names or nicknames: "Freda" (Freda Kacharski); "Church" (James Church); "Maje" (Major Saunders); "Sandtop" (James Saunders); "Shad" (James Lewis); "Babe" (Babe DiSalvo); "Knox" (Willy Knox). It was primarily these distinctive names on the list which were recognized and identified by the witness-

---

2. Lt. Bullen had spent eight years, and Sgt. Coen ten years, on their respective vice squads investigating gambling activities in and around Wilmington.

3. The sheets had previously been identified as being similar to banker's records by Agent Toscano, an expert witness.

4. There was no testimony that the experts had conducted any surveillance of the named individuals during June, 1964.

es. In addition, the four names with figures representing the highest dollar volume of business were all identified: "Knox", "Church", "Freda", and "Al" (Al DiCamillo). It is reasonable to expect that the witnesses would be more familiar with the "writers" who did the largest volume of business.

Both witnesses gave a total of seventeen separate identifications, out of the sixty "names",[5] together with a total of six locations. Three of these locations were mentioned as points visited by defendant during his daily routine: "Al's Tailor Shop", 12th and Tatnall, owned by "Al" DiCamillo; "Church's Cleaners", 6th and Walnut, owned by James "Church" Church; and a confectionary store at 23rd and Jessup, owned by Major "Maje" Saunders. These three locations are owned by three of the four highest volume writers.

In view of the manner in which the identifications were connected up to other evidence in the case, in view of the careful limiting instructions of the Court with respect to the identification attempts, and in view of the latitude of the discretion of the Court in the admission or exclusion of evidence, based on a host of tangible and intangible factors, the admission of the identification testimony was not error.

### V.

 During defense counsel's cross-examination of Lt. Bullen, defense counsel asked Bullen if he had ever given similar testimony in any court of law. Bullen replied that he had not. Later, in his closing argument, defense counsel made disparaging remarks about the Court's ruling which allowed the identification testimony: " * * * and that is another thing you will never see in a courtroom. * * * " At that point the Court interrupted defense counsel's closing remarks, called him to sidebar, and warned him that such remarks went far beyond the bounds of propriety and that any further remarks in that vein would

be cause for holding him in contempt of court.

After the charge to the jury, defense counsel excepted to the Court's warning. This exception was not briefed by defendant; it was mentioned only briefly by defense counsel at oral argument.

Defendant's argument seems to be that a warning of contempt proceedings during his final argument unfairly prejudiced his client, in that it distracted defense counsel and prevented him from presenting his case with the force and vigor required to convince the jury of his client's innocence.

The Court informed defense counsel at sidebar that the proper forum to criticize rulings by a trial judge is the reviewing court, not the jury. It is not clear whether defense counsel feels that the Court should have cited him for contempt without a warning, or that the Court had no authority to interrupt counsel's contemptuous closing remarks. No court has or would so hold. Defendant may not ask that the studied indiscretions of his own counsel be made the basis of a motion for acquittal or new trial. Nor can the Court imagine how defendant might have been unfairly prejudiced or limited in his closing remarks to the jury by a ruling which served to emasculate from his closing argument improper remarks only. No exception was taken to the Court's ruling at the time. The remarks were highly improper and defendant should have known it.

### VI.

 The defendant takes exception to the Court's denial of defendant's repeated requests for certain material under the Jencks Act, 18 U.S.C. § 3500. Defendant's request for these materials arose as follows.

The Government put Agent Toscano on the stand as an expert witness, generally qualified in the gambling business along the entire Northeast Coast. As an expert witness, Toscano testified on two specific matters only. First, he discussed

---

5. Both witnesses identified two names, "Babe" DiSalvo and James "Shad" Lewis.

the papers taken from defendant's home and identified them as, in his expert judgment, being similar to banker's records. Second, he computed the total amount of wagers represented by those records. He did not testify that defendant was a banker. He did not conclude that defendant was a banker. He did not testify to any personal knowledge he might have had from surveillance of the defendant.

After this direct examination, the defense requested and received Jencks memoranda and other materials for the purposes of cross-examination. At that point, the defense objected to the Government's production as not including all relevant material. The Government insisted that all relevant Jencks material had been produced, despite strenuous and continued objections by the defendant.

Later in the trial, it was shown that during May, 1964, Toscano was in the presence of a certain Government undercover agent, Italiano, who attempted to telephone wagers to Donlon, and Donlon refused to accept those wagers. *Defendant obtained this information from the face of the search warrants used for the raid on his home.*

Defendant's position is that materials relating to these calls should have been made available to him, for impeachment purposes, during the cross-examination of Toscano. Defendant bottoms this proposed impeachment on the theory that Toscano in his testimony concluded that Donlon was a banker.

There are at least four reasons why this contention of defendant is without merit.

First, Agent Toscano never testified that defendant Donlon was a banker; Toscano testified only as an expert witness, and his testimony was confined to his interpretation of the records found at defendant's home in the raid of June 19, 1964, and to a statement that the large amounts of cash found in defendant's pocket was indicative of banking activities. He testified that the form of the records was similar to banker's records; he computed the total amount of wagers represented by the records; he interpreted the records with respect to dates that wagers were entered. Toscano did not conclude, and would not have been permitted to conclude, that defendant was a banker. Defendant's argument, that evidence of the Government's failure to place wagers with defendant would impeach the "conclusion" of Agent Toscano that defendant was a banker, is unsound. Memoranda relating to such attempts to place wagers do not " * * * [relate] to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). Accordingly, the Government was not required to produce such materials. Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); United States v. Cardillo, 316 F.2d 606 (C.A.2, 1963).

■ Second, the holding of this Court on matters related to Jencks production will not be disturbed, unless "clearly erroneous." United States v. Cardillo, supra, at 616.

■ Third, defendant's motion is without merit where knowledge of the attempted wagers was available through another source, the search warrants. Even if the decision of this Court were "clearly erroneous", standing alone, the denial of such Jencks material does not constitute grounds for new trial or acquittal where the defendant already had knowledge of the material requested. Killian v. United States, 368 U.S. 231, 243–244, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961).

Fourth, the alleged unsuccessful telephone calls by Italiano to defendant were in May not June. Defendant later objected to the Government's attempted introduction of May 1964 surveillance evidence pertaining to defendant during the Government's examination of Agent Rapa. Defendant's objection was sustained. Thus defendant himself argued that attempts at placing wagers during May were not relevant to the direct testimony of the Government witnesses.

In a separate memorandum, defendant also contends that he was erroneously

denied Jencks materials relating to the same attempted placement of wagers, prior to cross-examination of Agent Rapa, who testified to his observations of defendant Donlon during six days of surveillance. Agent Rapa did not conclude that defendant was in fact a banker; he merely described his surveillance of defendant's actions. All of the previous four reasons that defendant's contentions are invalid with respect to production after Agent Toscano's testimony apply to production of the same materials after the testimony of Agent Rapa. In addition, defense counsel did not specifically ask for Jencks material from the month of May (presumably because counsel for defendant had just completed objecting to May surveillance evidence) after the Government's direct examination of Agent Rapa.

Defendant's contention is baseless for the reason that Jencks material pertaining to Rapa's May surveillance was neither requested nor denied.

### VII.

 Defendant's final ground for new trial is the Court's sustaining of the Government's objection to defense attempts to examine Agent Toscano (called as a defense witness) on unsuccessful attempts by undercover agent Italiano to place wagers with defendant, during May, 1964. This has just been discussed in another connection.

Defendant's position was never stated clearly, but the two reasons set out in favor of admission of testimony relating to these calls are: first, the general relevance of Donlon's refusal to take wagers during May, 1964, to the question of whether or not Donlon was a banker during the month of June; and second, to impeach the "conclusion" of Toscano that Donlon was a banker during the month of June.

As just observed, Toscano's earlier testimony did not include the conclusion that Donlon was a banker. Toscano did not testify as to any observations or surveillance of Donlon. Testimony on failure to place wagers with defendant during May would have had no effect on Toscano's earlier expert testimony, and was, therefore, irrelevant as impeachment material.

There might have been some question as to the general relevance of this line of testimony had not the defendant's previous objections to evidence relating to the month of May been sustained. Defendant's position at that time was that surveillance and observation evidence relating to the month of May was irrelevant and prejudicial where the charge related only to the month of June. Defendant has never altered his position to the Government's attempted proof that Donlon was engaged in banking activities during the month of May. However, defendant takes the clearly inconsistent position that while the May evidence which is unfavorable to him is irrelevant and inadmissible, nevertheless, bits and pieces of that evidence, taken out of context, are relevant and admissible. Either May evidence is relevant or it is not. The Court's decision to bar the Government from producing May evidence was an exercise of discretion weighted heavily in favor of defendant. Defendant is estopped from asserting the relevance of material he has himself declared irrelevant and prejudicial. The Government's objection was properly sustained.

 In a separate memorandum, counsel for defendant assigns as error this Court's refusal to allow cross-examination of Agent Rapa, again on the question of the attempted placement of wagers with defendant, during the month of May, 1964. It may be noted that defendant objected during Rapa's *direct* testimony to the introduction of any evidence from the month of May. Also, defendant never attempted to examine Agent Rapa on this point at any time during the trial. Defendant cannot argue that the Court's ruling that he could not examine Toscano on the wager attempts precluded him from bringing up this question on his cross-examination of Agent Rapa. The ruling affecting Toscano's testimony was made *after* defendant's cross-examination of Agent Rapa.

The record reflects that defense counsel had knowledge of the attempted placements of wagers at the time he cross-examined Agent Rapa. He did not attempt to examine Rapa on this point. Defendant cannot assign as error a ruling which this Court did not make on an offer which defendant did not attempt.

The motion for acquittal, or, in the alternative, for new trial, is dismissed.