UNITED STATES of America

v.

John William **BUTENKO** and Igor A.
Ivanov, Appellants.

UNITED STATES of America

v.

Igor A. **IVANOV**, Appellant.

Nos. 15170, 15232.

United States Court of Appeals
Third Circuit.

Argued June 17, 1966.

Decided Oct. 6, 1967.

Samuel A. Larner, Budd, Larner & Kent, Newark, N. J., for appellant in No. 15,170 (Ivanov).

Raymond A. Brown, Jersey City, N. J., for appellant in No. 15,232 (Butenko).

Sanford M. Jaffe, Special Asst. to the Atty. Gen., Dept. of Justice, Washington, D. C., David M. Satz, Jr., U. S. Atty.,

Newark, N. J., Edwin H. Stier, Asst. U. S. Atty., Barry D. Maurer, Asst. U. S. Atty., on the brief, for appellee.

Before GANEY and SMITH, Circuit Judges, and KIRKPATRICK, District Judge.

## OPINION OF THE COURT

GANEY, Circuit Judge.

The appellants, John William Butenko and Igor A. Ivanov, were indicted by a federal grand jury in Newark, New Jersey, in a bill of indictment containing three counts. Count I charged conspiracy to violate the provisions of 18 U.S.C. § 794(a) and (c),[1] count II charged conspiracy to violate the provisions of 18 U.S.C. § 951,[2] and count III alleged a substantive violation against John W. Butenko alone in violation of 18 U.S.C. § 951. Both defendants were found guilty on all counts by a jury and sentenced to the custody of the Attorney General, Butenko for thirty years and Ivanov for twenty years on count I, both were given five years on count II and on count III Butenko was given a sentence of ten years, the sentences on counts II and III to run concurrently with those imposed on count I. From these judgments, appeals were taken to this court and the matter is now before us for disposition as the court permitted the government's motion to consolidate the appeals of both defendants.

---

1. These subsections read as follows: "§ 794. Gathering or delivering defense information to aid foreign government

"(a) Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic, negative, blueprint, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be pun-

ished by death or by imprisonment for any term of years or for life.

\* \* \* \* \*

"(c) If two or more persons conspire to violate this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be subject to the punishment provided for the offense which is the object of such conspiracy. \* \* \*"

2. This section reads as follows: "Agents of foreign governments

"Whoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Secretary of State, shall be fined not more than $5,000 or imprisoned not more than ten years, or both. \* \* \*"

Under count I, a conspiracy was charged alleging an agreement among John W. Butenko and Igor A. Ivanov, as defendants, and Gleb A. Pavlov, Yuri A. Romashin and Vladimir I. Olenev, as co-conspirators, but not named as defendants, to unlawfully and knowingly conspire and agree to communicate and transmit to the Union of Soviet Socialist Republics, hereafter referred to as "U.S.S.R.", information relating to the national defense of the United States and, more specifically, information relating to the command and control system of the Strategic Air Command of the United States Air Force. It was further alleged that this activity was done with the intent and reason to believe that the said information would be used to the advantage of the U.S.S.R. The time within which the said conspiracy continued was from April 21, 1963, up to and including October 29, 1963.

The second count of the indictment charged Butenko and Ivanov, as defendants, and Pavlov, Olenev and Romashin, as co-conspirators, though not defendants, with conspiracy to violate 18 U.S.C. § 951. It alleged that John W. Butenko, not a diplomat or consular official or cultural attache, unlawfully and knowingly acted in the United States as an agent of the U.S.S.R. without prior notification of the Secretary of State of the United States, and that defendant, Igor A. Ivanov, and co-conspirators, Gleb A. Pavlov, Yuri A. Romashin and Vladimir I. Olenev, unlawfully and knowingly did aid and abet and induce John W. Butenko to so act.

The third count charged John W. Butenko alone with unlawfully and knowingly acting as an agent of the U.S.S.R. without notification to the Secretary of State of the United States and not then being a diplomat or consular official or cultural attache, with violation of 18 U.S.C. § 951.

The pertinent facts, for background, upon which the government relied for the conviction of the two defendants, as developed at the trial, are as follows: John W. Butenko, defendant, an American by birth, was an employe of the International Electronic Company, which is a subsidiary of International Telephone and Telegraph, and it was under contract with the United States Air Force to produce a command and control system for the Strategic Air Command. The project was given the name "465–L" and was an automatic electronic system which enabled the commander of the Strategic Air Command to alert and execute all his forces, at an extremely rapid rate to develop and plan his alternatives of operation and to give up to the minute status of the total force. Part of the operation of 465–L was the data transmission sub-system, whose function it was to permit rapid communication between Strategic Air Command headquarters and the various United States Air Force bases and missile sites. The four Strategic Air Command headquarter sites were located at Offutt Air Base, Nebraska; Westover Air Base, Massachusetts; Barksdale Air Base, Louisiana and March Air Base, California. It enabled the Strategic Air Commander to communicate with his bases at the speed of light. The operational breakdown of 465–L was divided into five sections, one of which was the field operations division, and defendant, John W. Butenko, was the Control Administrator for the same. It was the responsibility of the field operations division, and accordingly his, to check on installations and requirements at the various air and missile bases and handle arrangements with the United States Air Force for the actual installation, training of Air Force personnel, spare parts provisioning, as well as taking care of maintenance and handling general administrative duties. He applied for and was given top secret clearance which gave him access to documents of top secret, confidential and unclassified nature, as he could secure them on a need-to-know basis.

From July, 1961, to July, 1963, Butenko received monthly reports updating necessary information concerning current specifications required for the 465–L program which set out the title,

general subject matter, document classifications and specification numbers. The public did not have general access to the plant where Butenko was employed at Paramus, New Jersey, and the dissemination of the information concerning 465–L covered secret, confidential and unclassified information and even though some was unclassified, it could not be divulged to the general public unless permission from the Department of Defense and the Air Force was received. The contract between the Air Force and the Company was classified because parts of it were secret and top secret which made it a classified contract. The record discloses that all employes were made aware of the security requirements and were provided with a copy of the security manual which the defendant, Butenko, confirmed he had received.

The basis for the government's proof under the indictment was based largely on surveillance of the defendants and the co-conspirators by agents of the Federal Bureau of Investigation on April 21, 1963, May 26 and 27, 1963, September 23 and 24, 1963, and October 29, 1963.

Since the major contention of the appellants, both at argument and in their briefs, was that the evidence offered by the government was insufficient to support the averments in the indictment, and accordingly their convictions, it becomes necessary to recite in some detail much of the government's proof.

On April 21, 1963, the evidence showed that three agents of the Federal Bureau of Investigation conducted the surveillance, each testifying, sometimes piecemeal, as to the defendants' conduct, as one agent would have to break off surveillance and it would have to be taken up by another one, at a different position because of Soviet counter-surveillance, and the following was established: At 6:00 p. m., Agent Birch was in the Northvale, New Jersey area and took notice of a 1962 bluish-green station wagon, New York license plate No. 2N3078, with three Russian nationals seated therein, Igor A. Ivanov and Vladimir I. Olenev seated in the front seat with Gleb Pavlov, who was driving. He kept the station wagon under surveillance until it stopped at a restaurant, Lou's Hitching Post, in Closter, New Jersey, and defendant, Ivanov, and Olenev left the station wagon to enter the restaurant, and they were observed sitting together at a table for some time. The agent then noticed the station wagon for some twenty minutes making a series of turns in the area and a little later noticed it with Pavlov at the wheel on the shoulder of Piermont Road in Closter, New Jersey, at a point opposite the China Chalet Restaurant, which is in the area, and, almost at the same time, he noticed a 1961 Ford Falcon, four-door, turning from the road into and through the parking lot of the China Chalet Restaurant. This car was driven by John Butenko and the agent was able to read the license plate as New Jersey AVV871. At this point another agent picked up the surveillance and testified that a few minutes after the four-door Falcon sedan went into and through the parking lot of the China Chalet Restaurant, he observed the station wagon driven by Pavlov entering the parking lot of the nearby Finast supermarket. Through binoculars, he observed Pavlov leaving the station wagon and walking about twenty-five feet to the Ford Falcon, bearing license No. AVV871, which had already arrived there, and sat down in the front seat of the Falcon beside Butenko who was in the car when Pavlov entered the lot. They both sat in the front seat, talked for a short period of time and then Pavlov left the Falcon, this time carrying a light tan attache case. He then walked back to the station wagon with the attache case, re-entered it and drove out of the parking lot. When he entered the Falcon he had nothing in his hand whatsoever. The Soviet station wagon then proceeded to the lot of Lou's Hitching Post restaurant to Ivanov and Olenev, where, on two different occasions, they were seen dining together and several minutes later surveillance disclosed Ivanov and Olenev no longer in Lou's Hitching Post restaurant and also that the Soviet station wagon was not in the parking lot. The agent

then saw Butenko, about ten minutes later, leave the Falcon in the Finast parking lot and walk for a few minutes to Piermont Road and then walk back to the Falcon and re-enter it. After about eight minutes more, Butenko again left the Falcon, walked slowly across the parking lot to Piermont Road where he met Pavlov and then walked out of his sight on Piermont Road, and Pavlov was not carrying an attache case. Some ten or fifteen minutes later, Pavlov and Butenko were seated together in Angelo's Closter Manor Restaurant, having dinner and conversing, and about fifty minutes later, the agent observed them paying the check and both Pavlov and Butenko left the restaurant and walked to Piermont Road, at which time surveillance was broken off. Butenko later admitted he had a tan attache case when he left home that evening but denied passing it to Pavlov.

On May 26, 1963, Agents Broderick, Mulvaney, McDougall, James, Conway and Ness, all of whom provided the testimony, observed the same Chevrolet station wagon driving back and forth past the Finast parking lot where Pavlov and Butenko had met on the night of April 21st. Ivanov was driving it with Olenev in the front seat and Pavlov in the rear. This unusual tactic was repeated three or four times. Earlier that evening, at about 5:15 p. m., Butenko was observed leaving his home in Orange, New Jersey, carrying a tan attache case and entering his car. He was observed driving from Orange, New Jersey, to Closter, New Jersey, where he arrived about 6:00 p. m., and a few minutes after he had parked his car on the Finast lot, the station wagon, now occupied only by Pavlov, entered the parking lot and then drove out, followed immediately by Butenko who proceeded to follow the station wagon. At 7:05 p. m., Pavlov and Butenko drove past the Old Hook Inn where Olenev and Ivanov, the defendant, were seen standing by the side or the road in front of the Inn. Some fifteen minutes later, Pavlov was observed driving into the parking lot of the Inn, picking up Olenev and Ivanov and, after some conversation, the three men drove out of the lot. Later, at about 8:00 p. m., Butenko's car was observed in the parking lot of the Florentine Gardens restaurant which is about an hour's drive from the Old Hook Inn in the direction of Westwood, New Jersey, and Butenko could be observed in the bar until about 10:00 p. m. During this time he was seen leaving the restaurant on various occasions, going out to his car, opening the doors, looking in the front and back seats, as well as opening the trunk and feeling inside it. Finally, he entered his car and drove toward Orange, New Jersey, when observation was broken off. When Butenko testified in his own defense, he explained that his frequent trips to the car were made in an effort to find some lozenges.

It is submitted here that his conduct was conspiratorial and that surveillance rendered any passing of information impossible but which was accomplished the next day as here shown on May 27th.

The surveillance on May 27, 1963, was done by four agents of the F.B.I. At 3:45 p. m., Pavlov left the United Nations headquarters of the Soviet mission in New York, carrying a reddish-brown briefcase, tapered from bottom to top and accordion-like. A few minutes later, Ivanov was observed leaving the same building. At 5:45 p. m., Butenko left his work and drove to the Fort Lee area of New Jersey, and at approximately 8:00 p. m., Pavlov was seen standing next to a blue Falcon car bearing Butenko's license number, talking to a single individual sitting in the driver's seat of the blue Falcon. A half hour later, Butenko parked his car in the rear of 366 Park Avenue, Orange, New Jersey, near his home, and got out carrying a tan, reddish-brown briefcase, accordion-like and tapered from bottom to top. In his defense, he acknowledged coming home that evening with such a briefcase.

On the date of September 23rd, surveillance disclosed that Butenko came to an area described on exhibit G-19, which

is in or near Ridgewood, New Jersey, and also set out in exhibit G-30, later adverted to, and went up and down various streets making U-turns and following a circuitous pattern in a very unusual manner. The route taken on this day was described as a "dry-run". On September 24th, he took essentially the same route as that taken on September 23rd, with some minor deviations, and finally parked beside the Gold Key restaurant in the northern New Jersey area for some ten or fifteen minutes. During this time Pavlov and Romashin were standing across the road at a shopping center, looking in the direction of the Gold Key. About 8:20 p. m., the Falcon, with Butenko, left the Gold Key and drove south on Route 17, Pavlov and Romashin following in the Ford. The next observation of the Russian car was at about 9:10 p. m., when it was parked in a parking lot of Alexander's Shopping Center in Paramus, New Jersey, which is several miles from the Gold Key and a few minutes later, Romashin was seen to enter the car and drive out of the Alexander Center parking lot. At approximately 10:45 p. m., the Romashin car was proceeding west on Route 4 and an agent observed the Butenko car proceeding in the opposite direction, that is east, driven by Butenko and seated next to him was Gleb Pavlov. A review of G-19 and G-30, which was found later in Butenko's wallet, illustrates the above testimony.

On October 29th, 1963, the surveillance and arrest of the defendants was done by ten agents of the F.B.I. On that evening at seven o'clock, Butenko left his home in his blue Falcon sedan. He was carrying an attache case made of brown leather which he placed on the front seat and which was later introduced into evidence as G-28, Butenko acknowledging ownership of the case. He drove to Englewood, New Jersey, on the Garden State Parkway, and arrived there at a quarter to eight. Ivanov was observed at 6:00 p. m. in the vicinity of Englewood, New Jersey, driving a 1955 green Ford with Pavlov and Romashin as occupants. From 6:00 to 6:15 p. m., the three Russians were observed walking and driving in the vicinity of Dean Street, Englewood. The green Ford was seen at 7:00 p. m. at the Englewood railroad station and from 7:00 to 7:30 p. m. it was observed going back and forth across the railroad station parking lot and in and out of that station. During this period, there was extensive Soviet counter-surveillance and at one time Ivanov was driving and at another, Pavlov. At 7:37 p. m., Butenko's car was seen entering the railroad station and then leaving it and three minutes later, the Soviet automobile, with Pavlov, Romashin and Ivanov as occupants, left the railroad station. At 7:45 p. m., Butenko again drove in and out of the railroad station parking lot. At 7:55 p. m., Butenko's Falcon drove into the railroad station lot, parked, the headlights were turned off and the parking lights turned on. A few minutes later, the Soviet automobile, now driven by Pavlov with Ivanov in the right front seat, drove into the railroad station diagonally opposite to Butenko's automobile and the headlights were turned off and the parking lights turned on. After this signal was given, the Soviet car backed out of its parking space, came into the railroad station and parked perpendicular to the rear of the Falcon. Both cars remained in this position thirty-five seconds when the Soviet car pulled away toward the exit and the Falcon followed it. At 7:55 p. m., the Soviet automobile stopped at Grand Avenue and Tracy Place and Romashin left the car. Within two to three minutes, the F.B.I. moved in and arrested Butenko in his car, and some 200 to 300 feet away, Ivanov and Pavlov were arrested in the Soviet car. At the time of the arrest, Pavlov got out from behind the driver's wheel and Ivanov got out on the right side of the car.

It would seem that the evidence against Butenko was almost overwhelming as he had no valid reason for any association with Pavlov, Romashin and Olenev, who were Russian nationals attached to the Soviet mission to the United States, or with Ivanov, an employe of Amtorg Trad-

ing Company. His meetings with them in out-of-the-way places, in small communities in northern New Jersey can only be understandable if viewed, as they must be, in the light of the clandestine nature of them, at such hours as seven o'clock in the evening and in such places as parking lots behind supermarkets and railroad stations. None of the incidents hereinbefore recited were chance meetings, but gave every indication of being carefully worked out plans for the conspirators getting together.

The F.B.I. agents, following the arrest of the defendants, made an examination of the contents of the Soviet station wagon in which was found Butenko's attache case, two metallic electronic devices which were in fact signaling devices consisting of a transmitter and a receiver operating on a rechargeable battery, both of which devices were in excellent working condition, the receiver portion of the signaling device being found on the front seat where Ivanov and Pavlov had been sitting and the transmitter in a paper bag in the rear of the Soviet station wagon. In addition, in the shopping bag was found a radio with holes in the panel which, after its removal, there could be seen underneath the tube box a small compartment with a package which had been placed inside it, and when unwrapped, there was found a small camera in the guise of a cigarette case and two small film magazines. The cigarette case type camera was used primarily for photographing documents. There was no manufacturer's marking on it and it was custom-made. It had film in it fully loaded and ready to be operated.

Government exhibit G-28A was found in the briefcase of Butenko taken from the Soviet car. It described a major portion of the overall remote communications central located at the wing command post level, as well as the data located at the four major headquarter sites hereinabove referred to. It contained military and contract specifications which described the service conditions under which it was to be located and under which it must be operated; the maintainability aspects required and a goodly portion of the document concerned itself with the performance of the concentrator which is indicated in the title of the document, "RCC" meaning "Remote Communications Central" located at the wing command level and the heading, "EDLEC" meaning "Electronic Data Local Communications Central" which was located at each of the four headquarter sites.

The document G-28B, likewise found in Butenko's briefcase taken from the Soviet car, contained the applicable military and contractor specifications, as well as the essential elements of the concentrator. It provided details of each of the characteristics in terms of voltage, wave shape of the various internal concentrator pulses, as well as a table showing the relationship between the 465-L field data code and each of the corresponding letters and numbers and symbols that are used in the system. It was a document showing the time that the equipment necessary for the concentrator is required to operate properly without any failure or lessening of its requisite function, as well as the "mean time repair" which it would take to repair any particular malfunction. It provided the cabinet drawings, sketches of cabinet assemblies and a full discussion of the various components that comprise the equipment described. The letters "A" and "B" after G-27 and G-28 indicate the first and second revision of the particular document, thus indicating its up-to-date revision which, as has been stated, was distributed to all key employes, including defendant Butenko. The information contained in both G-28A and G-28B related solely and directly to the 465-L system.

These documents found in the Soviet Union station wagon in the briefcase of Butenko, which briefcase had been transferred from Butenko to Pavlov, the actual observation of its transfer was not had, as can be readily seen, related directly and specifically to the national defense of the country and were carefully screened from the public eye, and were

not in the public domain and could only be released by permission of the Secretary of Defense. Butenko had access to these documents only because of his top secret clearance status.

At the same time that the Soviet car was stopped, the Butenko car was likewise stopped and he was placed under arrest by the F.B.I. agents and taken to the office of the F.B.I. in Newark, New Jersey. He was asked to empty his pockets, which he did, and extracted a wallet from the left rear side of his trousers, and in the wallet was found exhibit G-30 which was a small piece of, paper folded, one side of which was a diagram showing the exact route which Butenko had taken on the 23rd and 24th of September, and on it was the following markings: "NI. Forever, (if something) Englewood, last sund, every m. 7.oo p. m. N2. Next. Ridgwood, N.J. Sept. 22 7.oo p. m." On the back of the folded slip of paper were twenty-one separate five digit numbers, two were repeats and two were G-28A and G-28B, numbers: the government introduced in evidence the remaining seventeen documents marked G-40 through G-56D, which corresponded to the seventeen five digit numbers on the slip of paper. These documents were all related to the 465-L system and, while it was not shown that they were in the possession of Butenko, it was the government's contention that this was in reality an espionage shopping list and that their inclusion on the slip of paper with the route traversed by Butenko on September 22nd showed the full scope of the conspiracy and its ultimate aim which had to be known to Butenko since it covered such a wide range of documents.

In his defense, Butenko asserted that he had to approve, among other things, sub-contractor requisitions and to decide whether the work was necessary and whether the money for its performance was within the budget and in the course of this phase of his work it was requisite that he be acquainted with all the requisitions of the 465-L system and to keep up to date thereon and he was able to do this by having the authority to secure any document that he deemed necessary on a need-to-know basis. This work which he and his associates were directly and indirectly responsible for in October of 1963 was worth about $25,-000,000. Likewise, he was a so-called "SRCC" (Simplex Remote Control Communicator), sub c Coordinator, and the "c" denotes its part of the 465-L equipment that was supposed to be at missile sites. He stated that since this equipment was in the development stage and there was no little confusion with respect to it his supervisor thought he would serve a very useful purpose as such Coordinator; that documents such as G-28A and G-28B supplied for him the necessary information to be helpful to him as he had to be closely associated with engineering proposals and that many times he took them home to study as well as examine them on other occasions when he was undisturbed by telephone calls and he further stated that G-28A and G-28B came from his file cabinets which were in an area assigned to him. He further testified that he never saw a top secret document all the time he was with the company and further that the briefcase which contained documents 28A and 28B were in his car and were taken from it by the agents at the time of his arrest and planted in the Soviet car.

He further testified that Pavlov was an individual known only to him as Lesnikopf whom he understood was somewhat vaguely related to affairs with the Soviet mission. He stated that initially his meetings with Lesnikopf were begun by Lesnikopf writing him a letter advising him that if he was interested in relatives in Russia he should meet him at the Chalet Restaurant in Closter and he would help him; that he went to the Chalet Restaurant, parked off the pavement when the man he knew as Lesnikopf came up to his car, asked his name and then invited him to dinner. They dined together and he kept meeting Lesnikopf (Pavlov) until the time of his arrest at the places the government witnesses testified they had placed him, but always

his reason for meeting Lesnikopf (Pavlov) was concerning information about his relatives in Russia. He denied that G-29, a wallet, and the slip of paper, G-30, on which was crudely drawn the streets which Butenko traveled on September 24th, and the digit numbers placed on the back thereof, hereinabove referred to, belonged to him, and that the reason G-28A and G-28B were found in his briefcase was that he secured them in order to read them at home and at other places at his convenience, undisturbed by telephone calls. In the main, this was the defense which Butenko interposed and, as has been indicated, after hearing all the evidence, he was found guilty by the jury.

██ Accordingly, it is submitted that the evidence, as herein stated in detail, covering the surveillance by the F.B.I. agents of Butenko, coupled with the G-29 exhibit of the wallet and G-30, showed his full acquaintance with the aspects of the 465-L system and the finding of the documents, G-28A and G-28B in his own briefcase taken from the possession of Pavlov, in addition to his clandestine meetings with Pavlov and on two occasions the transfer of his attache case to him at these meetings, clearly meets the government's contention that there was sufficient evidence to sustain the averments in the indictments of the conspiracy therein alleged. This is not a case of mere suspicion. United States v. Bufalino, 2 Cir., 285 F.2d 408. Here, there was substantial evidence to buttress the conviction. United States v. Guiliano, 263 F.2d 582, 584 (3d Cir. 1959); United States v. Johnson, 4 Cir., 324 F.2d 264; Diaz-Rosendo v. United States, 9 Cir., 357 F.2d 124, 129; United States v. Georga, 210 F.2d 45 (3d Cir. 1954).

██ As to Ivanov, while the evidence is less strong with respect to his participation in the conspiracy than that produced by the government against Butenko, since it is not as full nor as complete as against Butenko, as will be here indicated, sufficient evidence was offered by the government to show his intimate involvement with the conspiracy. Briefly related, they consisted in the main of the following: His involvement with the activities of Pavlov on April 21, 1963, as hereinabove recited, his activities with Pavlov and driving the Russian station wagon on May 26, 1963, hereinbefore recited, and the unusual circuitous driving pattern he followed in the area, and his activities on October 29, 1963, when he was observed driving a green Ford with a New York license number in the vicinity of Englewood, New Jersey, with Pavlov and Romashin seated in the rear thereof. For some time the three men were seen walking and driving in the general vicinity of Englewood and when next seen the car was in the Englewood railroad station parking lot where it remained for more than a half hour when the car was then seen going back and forth across the parking lot, out of the station, up and down adjoining streets, at one point driven by Ivanov and at another by Pavlov. Finally, Ivanov parked the car and all three got out and stood in the rear of it and were looking across a street directly at Operandi's Restaurant some 250 feet away. The three Russian nationals stood for several minutes behind the car when Ivanov walked across the street to the restaurant and stood looking very intently up and down the street for a few minutes when he was joined by Romashin, and then both went into the restaurant. Pavlov left the rear of the car and drove to the back of a closed filling station, got out and stood behind the rear of his car and kept looking at the restaurant all the while. A few minutes later, he got into the car, drove twice around a small park which faced the restaurant and parked some 150 feet from it and sat there a few minutes until he was joined by Romashin and Ivanov and they all got into the car and drove away. Some twenty minutes later, the Falcon, driven by Butenko, drove into the railroad station lot, parked, turned off the headlights and turned on the parking lights and within a few minutes the Soviet automobile, now driven by Pavlov with Ivanov in the right front seat, came into the park-

ing lot, signaled by turning off headlights and turning on parking lights. Here, there was a direct confrontation between Ivanov and Butenko and several minutes later, when the defendants were arrested, the briefcase of Butenko was found in the Soviet automobile. All of this evidence which the government produced closely identifies Ivanov with the conspiracy in that his associations with Pavlov were marked by conduct shrouded by secrecy and concealment, as a lookout for Pavlov, as well as actively engaged in furthering the conspiracy as the events on the evening of October 29th disclose. Additionally, no evident reason was shown for Ivanov's presence in the small New Jersey communities, nor that he was, in being there, furthering the business of his employer, the Amtorg Trading Company, and, accordingly, the evidence yields no reasonable hypothesis of innocence on his part and, on the other hand, tends to show his direct participation in activities which could only be found to be conspiratorial in nature.

The second count in the indictment charges John William Butenko and Igor A. Ivanov with unlawfully, willfully and knowingly conspiring and agreeing with each other and with Gleb A. Pavlov, Yuri A. Romashin and Vladimir I. Olenev, co-conspirators but not named defendants, to commit offenses against the United States, to wit, to violate 18 U.S.C. § 951.

It was part of said conspiracy that Butenko did unlawfully, willfully and knowingly act in the United States as an agent of a foreign government, to wit, the Union of Soviet Socialist Republics, without prior notification to the Secretary of State, and that the defendant, Ivanov, and co-conspirators, Pavlov, Olenev and Romashin, did unlawfully, willfully and knowingly aid, abet and procure the defendant, Butenko, to act in the United States as an agent of a foreign goverment, to wit, the Union of Soviet Socialist Republics, without prior notification to the Secretary of State. In order to make proof of the averments

in the second count of the indictment, the conspiracy as alleged in count I formed the basis of the proofs in connection with count II. The only additional factor offered in evidence was that Butenko had not registered with the Secretary of State as an agent of a foreign government. This was proven by testimony of the government that Butenko had not registered. It would be pure repetition to advert again to the factual averments which make up the conspiracy under the first count, already mentioned in detail, and together with the additional fact of Butenko's failing to register, just averted to, this it is contended by the government proves the allegations of the indictment under count II. With this we cannot agree.

It is submitted that an essential element in the proof of the conspiracy here obtaining must be that Ivanov and the other alleged co-conspirators had knowledge of the fact that Butenko had not registered as an agent of a foreign government, either directly or indirectly by a compelling inference. It is sufficient, as we have indicated, that when there is established by circumstantial evidence or by deduction from facts from which a natural inference arises, that the overt acts were in furtherance of a common design, intent and purpose, there is sufficient proof. While the circumstances obtaining here show clandestine meetings and secretive conduct on the part of Ivanov, as set forth heretofore, they advance us not at all, in supplying the factual issue of knowledge on the part of Ivanov and the others that Butenko had not registered. Ivanov was an employe of the Amtorg Trading Company, unlike Pavlov, Olenev and Romashin, who were attaches of the Russian mission to the United Nations, and, while it might be inferred that the latter could have had knowledge of the plan that Butenko was not registered with the Secretary of State, by virtue of their high position in the Soviet mission to the United Nations, this inference could not be drawn against Ivanov, a mere employe of Amtorg. Here, knowledge of the

fact, on the part of Ivanov, that Butenko had not registered, was a basic matter of proof which, as has been indicated, the record did not disclose. Ingram v. United States, 360 U.S. 672–678, 79 S.Ct. 1314, 3 L.Ed.2d 1503; von Clemm v. Smith, D.C., 255 F.Supp. 353, 368, aff'd 2 Cir., 363 F.2d 19. The fact that the government, in the introduction of exhibit G–16, showed that Ivanov had filed a statement with the Department of State showing his familiarity with the Foreign Agents Registration Act of 1938, as amended, under which there was a heading, 1(a) of instructions, which stated, quoting portions of the Act of June 25, 1948, wherein it was provided that no person other than a diplomat or consular officer or attache should act in the United States as an agent for a foreign government without prior notification to the Secretary of State, this showed only that he was familiar with the fact of registration, but it furthers, in no wise, the necessary essential that he knew Butenko had not registered as a foreign agent. Acccordingly, it is submitted that, with respect to Ivanov, as to count II of the indictment, there must be a judgment of acquittal for lack of sufficient proof thereunder. However, this makes no difference in the disposition of the case because the sentence imposed on Ivanov under count I was for twenty years, which was within the limits of that permitted by the statute whose maximum was thirty years, and since the current sentence imposed under count II was five years, Ivanov cannot, on appeal, challenge his conviction on count II. Lawn v. United States, 355 U.S. 339, 359, 78 S.Ct. 311, 2 L.Ed.2d 321, citing Sinclair v. United States, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692; Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774. The appeal of double punishment with regard to the double conviction on both counts I and II cannot be considered a ground for reversal. United States v. Goldman, 352 F.2d 263 (3d Cir. 1965).

■ As respects Butenko's situation with reference to count II, it is sub-mitted he knew he was not registered and the burden of proof was cast upon him to show more than mere denial since it is always an essential element of a crime such as this since the burden of going forward on the issue is placed on a defendant where, as here, the matter is peculiarly within his own knowledge. Edwards v. United States, 5 Cir., 334 F.2d 360, 366; Blumenthal v. United States, 8 Cir., 88 F.2d 522. However, Butenko's conviction on count II, even if we assume no conspirary was shown by reason of lack of knowledge on the part of Pavlov, Romashin and Olenev that he was not registered, nevertheless does not affect the term of his sentence, as the same reasoning is applicable here as to that concerning Ivanov in count II hereof by reason of the fact that the sentence imposed on Butenko on count II, since it ran concurrently with that imposed on count I, being ten years, was, likewise, within the term validly imposed in count I. Lawn v. United States, supra, et al.

■ Similarly, it is unnecessary for us to consider the contentions of Butenko as to count III of the indictment in view of Lawn v. United States, supra, 355 U.S. at 359, 78 S.Ct. at 322. However, as to this count, which charges Butenko with the substantive offense of failing to register as an agent of a foreign government, there can be no question that he did not register as a foreign agent, as the record shows, and, accordingly, he knew that he had not registered as a foreign agent. Much was made in argument that Butenko was not an agent of the Soviet Union in that there was shown no contractual relationship between himself and the Soviet Union. However, this is not requisite nor necessary. As we have shown, as adverted to previously, the conduct of Butenko in connection with the transfer of classified documents to a representative of the Soviet mission, Pavlov, was sufficient to bring Butenko within the provisions of the statute. Furthermore, as has been indicated, a contractual relationship is unnecessary, since the act it-

self does not define the word "agent". The few judicial decisions in the field do not discuss the definition in any detail. The cases assume that it means one who acts directly or indirectly for the benefit of a foreign government. von Clemm v. Smith, supra; von Clemm v. United States, 320 U.S. 769, 64 S.Ct. 81, 88 L.Ed. 459; Hansen v. Brownell, 98 U.S.App.D.C. 239, 234 F.2d 60; United States v. Heine, 2 Cir., 151 F.2d 813, 817.

Appellants also question whether or not the object of the conspiracy concerned national defense. Here the matter was left entirely in the jury's hands under proper instruction in conformity with Gorin v. United States, 312 U.S. 19–32, 61 S.Ct. 429, 439, 85 L.Ed. 488, wherein the court said, in part: "It is not the function of the court, where reasonable men may differ, to determine whether the acts do or do not come within the ambit of the statute. The question of the connection of the information with national defense is a question of fact to be determined by the jury as negligence upon undisputed facts is determined."

A critical examination of the court's charge relative to the crime of conspiracy leaves no room here for exception, as it was done correctly, at length and with great clarity.

### DISCUSSION OF OTHER LEGAL POINTS RAISED.

■■■■■■ A point raised is the District Court's refusal to suppress certain physical evidence because of an assertedly unreasonable search and seizure. On the record, agents of the F.B.I. had reasonable cause to arrest Ivanov without a warrant. As to Butenko, he was arrested pursuant to a warrant already obtained. They also had reasonable cause to believe that a crime was being committed in their presence and that Ivanov was one of the co-conspirators. It was not necessary under the circumstances for them to have obtained a warrant for his arrest. Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Nor was

it necessary for them to have obtained a warrant to search the green Ford sedan. The agents' subsequent search of that car was closely related to the reason Ivanov was arrested. Cooper v. State of California, 386 U.S. 58, 61–62, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); United States v. Dento, 382 F.2d 361, (C.A. 3, August 2, 1967). Likewise, the district court did not err in refusing to suppress the evidence in question.

Another point raised on appeal is the defendants' contention that by reason of the action of the State Department they had been deprived effectively of their right under the Sixth Amendment to have compulsory process for obtaining the attendance of witnesses in their behalf.

On October 30, 1963, the State Department caused a diplomatic note to be sent from the United States Mission to the United Nations to the Permanent Mission of the Union of Soviet Socialist Republics to the United Nations concerning the involvement of Olenev, Pavlov and Romashin in espionage activities against the United States. In that note, the three accredited representatives of the Soviet mission were declared *persona non grata* because they had violated § 13(b) of the Headquarters Agreement between the United Nations and the United States. 22 U.S.C.A. § 287 note. The note requested that the three named representatives depart the United States on or before November 1, 1963. On the latter date counsel for Butenko, in a telegram addressed to the State Department, requested a stay of the terms of the diplomatic note to give him an opportunity to confer with the three representatives before they departed. On the same day the State Department sent a telegram to Butenko's counsel advising him that the departure request would be superseded until November 4, 1963. However, the three Soviet representatives departed the same day the telegrams were exchanged. From the time they departed, the precise whereabouts of the three Soviet representatives were

unknown to defendants. The prosecution admits that they were beyond the jurisdiction of the district court.

Some months before the trial, District Judge Anthony T. Augelli signed an order on August 6, 1964, granting Butenko's request to take the deposition at government expense of the three former Soviet representatives to the United Nations, provided that Butenko could show that the three representatives would be willing to testify at oral deposition and that the Soviet Union would permit such an examination or would insist that Letters Rogatory be used. Approximately a month later, Butenko's counsel informed the district court that he was unable to secure any answer from the Soviet authorities with regard to the satisfaction of the conditions of the Court's order of August 6th, and requested a continuance for additional time to obtain a response from the Soviet government. The request was denied, the Court stating that more than sufficient time had been allowed to appellants.

■ It is submitted that the United States is not to be penalized for the inability of defendants to summon the three former Soviet representatives in their defense nor be required to forego prosecution until it produces those three individuals. By virtue of § 15 of the Headquarters Agreement the three Soviet representatives were "entitled in the territory of the United States to the same privileges and immunities, subject to the corresponding conditions and obligations, as it accords to diplomatic envoys accredited to it." A diplomatic envoy accredited to the United States is immune from compulsory process to testify in a court of the United States. Rev.Stat. § 4063, 22 U.S.C.A. § 252; Dupont v. Pichon, 4 U.S. (4 Dall.) 321, 1 L.Ed. 851 (1805); Restatement (Second), Foreign Relations Law § 73. Such immunity may be waived only on behalf of the sending state. Restatement (Second), Foreign Relations Law § 79. Here the State Department treated the three Soviet representatives as having been en-titled to diplomatic immunity.[3] To end that status the State Department declared them to be *persona non grata.* Although their diplomatic immunity ended when they departed, all three from the time of their departure were beyond the jurisdiction of the district court and not available for any purposes to either the United States or the defendants.

■ But even if the State Department had not made the declaration and the three representatives had remained in the United States, there has been no showing that the Soviet Government would have waived the diplomatic immunity of the three and permitted them to testify in court and even indicate what they would say if they were permitted to testify. On the contrary, the record shows that the Soviet authorities have ignored the request by counsel for Butenko for permission to permit the three former representatives to testify by deposition or answer Letters Rogatory. Since the immunity is waived by the Sovereign and not the individual, as indicated, there is no showing that it would be waived or that their testimony would be favorable to the defense. Accordingly, no prejudice is found by reason of their departure.

Next, defendants claim the trial court committed reversible error in refusing to permit counsel to examine memoranda and reports of government agents which related to the subject matter of the indictment but not to the direct testimony of the agents who testified on behalf of the prosecution. In other words they contend that where an agent participated in more than one aspect of an investigation, but is called upon by the prosecution to testify only as to less than all of those aspects, his report relating to all other phases must be provided for the benefit of defense counsel pursuant to subsection (b) of § 3500 of the so-called Jencks Act, 18 U.S.C.A. § 3500(b).

During the course of the trial, after government agents testified on direct examination the prosecution made available to defense counsel those reports which

---

3. See Arcaya v. Paez, D.C., 145 F.Supp. 464, aff'd 244 F.2d 958 (C.A.2, 1956).

it believed related to the testimony given by that particular witness. In each instance the trial judge declared a recess for the purpose of his examining additional reports to determine whether he should order the prosecution to deliver them to defendants for their examination and use. After he had examined those reports, the trial judge found that they did not relate to the subject matter to which the witness had just testified on direct examination. He therefore refused to instruct the prosecution to deliver them directly to the defendants.

 Before a defendant is entitled to the delivery of a statement it must not only be one within the meaning of subsection (e) of § 3500, but it must also comply with the provisions of subsection (b) of this section.[4] Clearly if the entire statement does not relate to the subject matter of the indictment or information, the defendant is not entitled to a delivery of that statement over the objection of the prosecution. Rosenberg v. United States, 360 U.S. 367, 370, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959). And in our opinion a defendant is not entitled to statements when they do not relate to the subject matter as to which the witness has testified on direct examination, even though they relate to the subject matter of the indictment, information or investigation. See, for example:

United States v. Donlon, 256 F.Supp. 336, 341–343 (D.C.Del.1966), aff'd per curiam 370 F.2d 987 (C.A. 3, 1967); United States v. Birnbaum, 337 F.2d 490, 497–498 (C.A. 2, 1964); United States v. Heap, 345 F.2d 170 (C.A. 2, 1965); United States v. Umans, 368 F.2d 725, 731 (C.A. 2, 1966); Williamson v. United States, 365 F.2d 12, 15–16 (C.A. 5, 1966); Oertle v. United States, 370 F.2d 719, 723–725 (C.A. 10, 1966). In addition to setting forth the conditions under which it was to be delivered over to the defendant, Congress was very careful in limiting the type of statement that was to be so delivered. Subsection (b) contains but two sentences. In the first Congress referred to the statement as one which relates to the subject matter "as to which the witness has testified." In the second as being one which relates to the subject matter of "the testimony of the witness." And in subsection (c) to this section it refers to the statement twice as one which does not relate or relates to the subject matter of "the testimony of the witness."[5]

Other points raised by the appellant are devoid of merit and are not discussed.

The judgment in appeal No. 15170 as to Ivanov is affirmed as to count I and a judgment of acquittal is directed to be entered on count II thereof. The judgment in appeal No. 11232 as to Butenko is affirmed on all counts.

4. Section 3500(b) of the Jencks Act provides: "(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of defendant, order the United States to produce any statement * * * of the witness in the possession of the United States which *relates to the subject matter as to which the witness has testified.* If the entire contents of any such statement *relate to the subject matter of the testimony of the witness,* the court shall order it to be delivered directly to the defendant for his examination and use." (Emphasis added.)

5. Senate Report No. 981 to the bill to amend the Criminal Code to provide for the production of statements and reports of government witnesses refers to them as follows:
"* * * relating to matter as to which the witness has testified.";
"* * * touching the events and activities as to which a Government witness has testified at trial, * * *.";
"* * * relate to the subject matter of the testimony of the witness.";
"* * * relate to the testimony of the witness at trial";
and
"* * * relates to the testimony of the witness."
See 1957 U.S.Code Cong. and Adm. News. pp. 1861, at 1862 and 1864.