**UNITED STATES of America, Appellee,**

v.

**TRUONG DINH HUNG, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Ronald Louis HUMPHREY, Appellant.**

**Nos. 78–5176, 78–5177.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 6, 1979.

Decided July 17, 1980.

Michael E. Tigar, Washington, D. C. (John Mage, John J. Privitera, Washington, D. C., Marvin D. Miller, Alexandria, Va., on brief), for appellant Truong Dinh Hung.

Mark Foster, Washington, D. C. (Moore & Foster, Roger E. Zuckerman, Zuckerman, Spaeder & Taylor, Warren L. Miller, Stein, Halpert & Miller, Washington, D. C., on brief), for appellant Ronald Louis Humphrey.

Jerome M. Feit, Dept. of Justice, Washington, D. C. (William G. Otis, Robert J. Erickson, Paul J. Brysh, Elliott Schulder, David R. Homer, Ann T. Wallace, Dept. of Justice, Washington, D. C., William B. Cummings, U. S. Atty., Justin Williams, Asst. U. S. Atty., Alexandria, Va., on brief), and Kenneth C. Bass, III, Reston, Va., for appellee.

Marshall Perlin, New York City, on brief, for amicus curiae National Alliance Against Racist and Political Repression.

Before WINTER, RUSSELL and HALL, Circuit Judges.

WINTER, Circuit Judge:

Truong Dinh Hung, more familiarly known as David Truong, and Ronald Humphrey were convicted of espionage, conspiracy to commit espionage and several espionage-related offenses for transmitting classified United States government information to representatives of the government of the Socialist Republic of Vietnam. In these appeals, they seek reversal of their convictions because of warrantless surveillance and searches, the alleged inapplicability of the espionage statutes and the theft-of-government-property statute to the facts of this case, several alleged Jencks Act violations, an alleged denial of compulsory process, and claimed error in a number of the district court's evidentiary rulings.

We hold that the warrantless searches and surveillance did not violate the Fourth Amendment, that the espionage statutes were properly and constitutionally applied to this case, that the defendants were not denied compulsory process, and that the district court did not err in any of its evidentiary rulings. Relying on the concurrent sentence doctrine, the majority holds that we should not rule on defendants' claim that the theft-of-government-property statute does not apply to this case. However, for myself, I would conclude that the issue concerning the theft-of-government-property statute should be addressed and that the statute does not encompass the actions of the defendants. I would therefore reverse their convictions under that statute. We are unanimous, however, in remanding the case to the district court for further proceedings to determine whether documents produced by the government near the end of trial contain Jencks Act material that should have been supplied to the defense.

I.

David Truong, a Vietnamese citizen and son of a prominent Vietnamese political figure, came to the United States in 1965. At least since his arrival in the United States, Truong has pursued an active scholarly and political interest in Vietnam and the relationship between Vietnam and the United States. In 1976, Truong met Dung Krall, a Vietnamese-American, the wife of the an American Naval Officer, who had extensive contacts among the Vietnamese community in Paris. Truong persuaded Krall to carry packages for him to Vietnamese in Paris. The recipients were representatives of the Socialist Republic of Vietnam at the time of the 1977 Paris negotiations between that country and the United States. The packages contained copies of diplomatic cables and other classified papers of the United States government dealing with Southeast Asia. Truong procured the copies from Ronald Humphrey, an employee of the

United States Information Agency, who obtained the documents surreptitiously, copied them, removed their classification markings and furnished the copies to Truong. In a statement given after his arrest, Humphrey said that his motive was to improve relations between the North Vietnamese government and the United States so that he could be reunited with a woman whom he loved who was a prisoner of the North Vietnamese government.

Unknown to Truong, Krall was a confidential informant employed by the CIA and the FBI. Krall kept these agencies fully informed of Truong's activities and presented the packages Truong had given her to the FBI for inspection, copying and approval before she carried the documents to Paris. The FBI permitted this operation to continue, while monitoring it closely, from approximately September, 1976, until January 31, 1978.

When the intelligence agencies first learned that Truong was transmitting classified documents to Paris, they were understandably extremely anxious to locate Truong's source for his data. Toward that end, the government conducted a massive surveillance of Truong. Truong's phone was tapped and his apartment was bugged from May, 1977 to January, 1978.[1] The telephone interception continued for 268 days and every conversation, with possibly one exception, was monitored and virtually all were taped. The eavesdropping device was operative for approximately 255 days and it ran continuously. No court authorization was ever sought or obtained for the installation and maintenance of the telephone tap or the bug. The government thus ascertained that Humphrey was providing Truong with the copies of secret documents. This leak of sensitive information of course ceased when Truong and Humphrey were arrested on January 31, 1978.

After a protracted trial, Truong and Humphrey were both convicted of espionage and conspiracy to commit espionage in violation of 18 U.S.C. §§ 371 and 794(a) and (c). They were also convicted of conspiracy to convert classified government documents exceeding $100 in value and conversion, in violation of 18 U.S.C. §§ 371 and 641; acting as agents of a foreign government without prior notification to the Secretary of State in violation of 18 U.S.C. §§ 951 and 2; delivery of material related to the national defense to unauthorized persons in violation of 18 U.S.C. §§ 793(e) and 2; and conspiracy to violate 50 U.S.C. § 783(b) and (c), which penalize government employees who transmit, and foreign agents who thereby receive, classified information.

## II.

### A. Foreign Intelligence Exception to the Warrant Requirement

The defendants raise a substantial challenge to their convictions by urging that the surveillance conducted by the FBI violated the Fourth Amendment and that all the evidence uncovered through that surveillance must consequently be suppressed. As has been stated, the government did not seek a warrant for the eavesdropping on Truong's phone conversations or the bugging of his apartment. Instead, it relied upon a "foreign intelligence" exception to the Fourth Amendment's warrant requirement. In the area of foreign intelligence, the government contends, the President may authorize surveillance without seeking a judicial warrant because of his constitutional prerogatives in the area of foreign affairs. On this basis, the FBI sought and received approval for the surveillance from the President's delegate, the Attorney General. This approval alone, according to the government, is constitutionally sufficient to authorize foreign intelligence surveillance such as the surveillance of Truong.

The district court accepted the government's argument that there exists a foreign intelligence exception to the warrant requirement. The district court, however, also decided that the executive could pro-

---

1. For eighty-five days, from June to September, 1977, the FBI also video-taped Humphrey's activities in his office at the United States Information Agency.

ceed without a warrant only so long as the investigation was "primarily" a foreign intelligence investigation. The district court decided that the FBI investigation had become primarily a criminal investigation by July 20, 1977, and excluded all evidence secured through warrantless surveillance after that date. Conversely, all evidence secured before July 20 was not suppressed by the district court, because it determined that during that period the investigation primarily concerned foreign intelligence.

█ We agree with the district court that the Executive Branch need not always obtain a warrant for foreign intelligence surveillance. Although the Supreme Court has never decided the issue which is presented to us, it formulated the analytical approach which we employ here in an analogous case, *United States v. United States District Court (Keith)*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). In *Keith*, the executive had conducted warrantless domestic security surveillance. The Court posited two inquiries to guide the Fourth Amendment determination of whether a warrant is required:

> If the legitimate need of Government to safeguard domestic security requires the use of electronic surveillance, the question is whether the needs of citizens for privacy and free expression may not be better protected by requiring a warrant before such surveillance is undertaken. We must also ask whether a warrant would unduly frustrate the efforts of Government to protect itself from acts of subversion and overthrow directed against it.

407 U.S. at 315, 92 S.Ct. at 2135. Balancing individual privacy and government needs, the Supreme Court concluded that the executive must seek a warrant before it undertakes domestic security surveillance.

For several reasons, the needs of the executive are so compelling in the area of foreign intelligence, unlike the area of domestic security, that a uniform warrant requirement would, following *Keith*, "unduly frustrate" the President in carrying out his foreign affairs responsibilities. First of all, attempts to counter foreign threats to the national security require the utmost stealth, speed, and secrecy. A warrant requirement would add a procedural hurdle that would reduce the flexibility of executive foreign intelligence initiatives, in some cases delay executive response to foreign intelligence threats, and increase the chance of leaks regarding sensitive executive operations.[2] *See Zweibon v. Mitchell*, 516 F.2d 594, 704 (D.C.Cir.1975) (Wilkey, J., concurring and dissenting).

More importantly, the executive possesses unparalleled expertise to make the decision whether to conduct foreign intelligence surveillance, whereas the judiciary is largely inexperienced in making the delicate and complex decisions that lie behind foreign intelligence surveillance. *See New York Times Co. v. United States*, 403 U.S. 713, 727–30, 91 S.Ct. 2140, 2148–2150, 29 L.Ed.2d 822 (1971) (Stewart, J., concurring); *United States v. Belmont*, 301 U.S. 324, 330, 57 S.Ct. 758, 760, 81 L.Ed. 1134 (1937). The executive branch, containing the State Department, the intelligence agencies, and the military, is constantly aware of the nation's security needs and the magnitude of external threats posed by a panoply of foreign nations and organizations. On the other hand, while the courts possess expertise in making the probable cause determination involved in surveillance of suspected criminals, the courts are unschooled in diplomacy

---

2. The practical difficulties of obtaining a warrant for foreign intelligence surveillance were particularly acute at the time this surveillance was conducted, because Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 20, which specifies warrant procedures, contained no procedures tailored to foreign intelligence surveillance. In fact, in Title III Congress explicitly chose not to address the sort of surveillance involved in this case when it disclaimed any intent to "limit the constitutional power of the President to take such measures as he deems necessary . . . to protect national security information against foreign intelligence activities." 18 U.S.C. § 2511(3). That disclaimer was repealed by the Foreign Intelligence Surveillance Act of 1978, *see* note 4, *infra*, which established a mechanism to govern the issuance of warrants for foreign intelligence surveillance.

and military affairs, a mastery of which would be essential to passing upon an executive branch request that a foreign intelligence wiretap be authorized. Few, if any, district courts would be truly competent to judge the importance of particular information to the security of the United States or the "probable cause" to demonstrate that the government in fact needs to recover that information from one particular source.[3]

Perhaps most crucially, the executive branch not only has superior expertise in the area of foreign intelligence, it is also constitutionally designated as the pre-eminent authority in foreign affairs. *See First National Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 765–68, 92 S.Ct. 1808, 1812–1814, 32 L.Ed.2d 466 (1972); *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 310, 62 L.Ed. 726 (1918). The President and his deputies are charged by the constitution with the conduct of the foreign policy of the United States in times of war and peace. *See United States v. Curtiss-Wright Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed.

255 (1936). Just as the separation of powers in *Keith* forced the executive to recognize a judicial role when the President conducts domestic security surveillance, 407 U.S. at 316–18, 92 S.Ct. at 2136–2137, so the separation of powers requires us to acknowledge the principal responsibility of the President for foreign affairs and concomitantly for foreign intelligence surveillance.

In sum, because of the need of the executive branch for flexibility, its practical experience, and its constitutional competence, the courts should not require the executive to secure a warrant each time it conducts foreign intelligence surveillance. *Accord, United States v. Butenko,* 494 F.2d 593 (3 Cir.), *cert. denied sub nom., Ivanov v. United States,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974); *United States v. Brown,* 484 F.2d 418 (5 Cir. 1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974); *United States v. Clay,* 430 F.2d 165 (5 Cir. 1970), *rev'd on other grounds,* 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1971).[4] *Contra, Zweibon v.*

**3.** *See* note 4, *infra,* for a discussion of the Foreign Intelligence Surveillance Act of 1978, which authorizes the Chief Justice to choose seven judges to pass on similar issues. That statute, however, limits the authority of the judge over such issues by prescribing a "clearly erroneous" standard of review. The statute will encourage the development of foreign intelligence expertise among these seven judges by empowering them to hear all foreign intelligence warrant requests.

**4.** Since the surveillance was conducted in this case, Congress has enacted the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. § 1801 *et seq.* That statute requires that executive officials seek prior judicial approval for some foreign intelligence surveillance. The Act does not, however, transport the traditional Fourth Amendment warrant requirement unaltered into the foreign intelligence field. The statute does not contain a blanket warrant requirement; rather, it exempts certain categories of foreign intelligence surveillance. 50 U.S.C. § 1802. Nor does the statute require the executive to satisfy the usual standards for the issuance of a warrant; the executive need demonstrate only probable cause that the target is a foreign power or a foreign agent and, in the case of United States citizens and resident aliens, that the government is not clearly erro-

neous in believing that the information sought is the desired foreign intelligence information and that the information cannot be reasonably obtained by normal methods. 50 U.S.C. § 1805, § 1804(a)(7)(E). Finally, the statute empowers the Chief Justice to designate seven judges to hear the requests for foreign intelligence warrants and thus creates a special group of judges who will develop expertise in this arcane area. 50 U.S.C. § 1803.

While the Act suggests that it is possible for the executive branch to conduct at least some types of foreign intelligence surveillance while being subject to a warrant requirement, the complexity of the statute also suggests that the imposition of a warrant requirement, beyond the constitutional minimum described in this opinion, should be left to the intricate balancing performed in the course of the legislative process by Congress and the President. The elaborate structure of the statute demonstrates that the political branches need great flexibility to reach the compromises and formulate the standards which will govern foreign intelligence surveillance. Thus, the Act teaches that it would be unwise for the judiciary, inexpert in foreign intelligence, to attempt to enunciate an equally elaborate structure for core foreign intelligence surveillance under the guise of a con-

*Mitchell,* 516 F.2d 594 (D.C.Cir.1975) (dictum in plurality opinion in case involving surveillance of domestic organization having an effect on foreign relations but acting neither as the agent of nor in collaboration with a foreign power).

However, because individual privacy interests are severely compromised any time the government conducts surveillance without prior judicial approval, this foreign intelligence exception to the Fourth Amendment warrant requirement must be carefully limited to those situations in which the interests of the executive are paramount. First, the government should be relieved of seeking a warrant only when the object of the search or the surveillance is a foreign power, its agent or collaborators. *Cf. Zweibon v. Mitchell,* 516 F.2d 594, 613 n.42 (D.C. Cir.1975). In such cases, the government has the greatest need for speed, stealth, and secrecy, and the surveillance in such cases is most likely to call into play difficult and subtle judgments about foreign and military affairs. When there is no foreign connection, the executive's needs become less compelling; and the surveillance more closely resembles the surveillance of suspected criminals, which must be authorized by warrant. Thus, if the government wishes to wiretap the phone of a government employee who is stealing sensitive documents for his personal reading or to leak to a newspaper, for instance, the absence of a foreign connection and the importance of individual privacy concerns contained within the Fourth Amendment lead to a requirement that the executive secure advance judicial approval for surveillance. *See Zweibon v. Mitchell,* 516 F.2d 594, 703–04 (D.C.Cir.1975) (Wilkey, J., concurring and dissenting).

■ The surveillance in this case clearly satisfied this limitation upon the foreign intelligence exception to the warrant requirement. Krall, the government agent, received a letter of introduction to Truong through Dong, the president of the Viet-

namese Association in Paris. According to Krall, Truong gave her documents to carry back to Dong, who handed the documents to representatives of the Vietnamese government. In addition, Krall testified that the Vietnamese ambassador to the United Nations told her that Truong had volunteered to obtain documents for the Vietnamese government. Moreover, Krall stated that Truong gave her documents to deliver to Phan Thanh Nam, head of the Vietnamese mission in Paris, who in turn gave her a letter for Truong. Obviously, there was ample evidence that tended to show collaboration with Vietnam on the part of Truong.

Second, as the district court ruled, the executive should be excused from securing a warrant only when the surveillance is conducted "primarily" for foreign intelligence reasons. We think that the district court adopted the proper test, because once surveillance becomes primarily a criminal investigation, the courts are entirely competent to make the usual probable cause determination, and because, importantly, individual privacy interests come to the fore and government foreign policy concerns recede when the government is primarily attempting to form the basis for a criminal prosecution. We thus reject the government's assertion that, if surveillance is to any degree directed at gathering foreign intelligence, the executive may ignore the warrant requirement of the Fourth Amendment.

The defendants urge that the "primarily" test does not go far enough to protect privacy interests. They argue that the government should be able to avoid the warrant requirement only when the surveillance is conducted "solely" for foreign policy reasons. The proposed "solely" test is unacceptable, however, because almost all foreign intelligence investigations are in part criminal investigations. Although espionage prosecutions are rare, there is always the possibility that the targets of the

---

stitutional decision. Such an attempt would be particularly ill-advised because it would not be easily subject to adjustment as the political

branches gain experience in working with a warrant requirement in the foreign intelligence area.

investigation will be prosecuted for criminal violations.[5] Thus, if the defendants' "solely" test were adopted, the executive would be required to obtain a warrant almost every time it undertakes foreign intelligence surveillance, and, as indicated above, such a requirement would fail to give adequate consideration to the needs and responsibilities of the executive in the foreign intelligence area.

In this case, the district court concluded that on July 20, 1977, the investigation of Truong had become primarily a criminal investigation. Although the Criminal Division of the Justice Department had been aware of the investigation from its inception, until summer the Criminal Division had not taken a central role in the investigation. On July 19 and July 20, however, several memoranda circulated between the Justice Department and the various intelligence and national security agencies indicating that the government had begun to assemble a criminal prosecution. On the facts of this case, the district court's finding that July 20 was the critical date when the investigation became primarily a criminal investigation was clearly correct.

Therefore, because there was more than enough evidence to indicate that Truong had collaborated with the Vietnamese government and because the district court did not err in choosing July 20 as the date when the investigation became primarily a criminal investigation, we do not disturb the decision of the district court to exclude all evidence obtained through the surveillance after July 20 but to permit the government to introduce evidence secured through the surveillance before July 20.

Because the Fourth Amendment warrant requirement is a critical constitutional protection of individual privacy, this discussion should conclude by underscoring the limited nature of this foreign intelligence exception to the warrant requirement which we recognize in the instant case. The exception applies only to foreign powers, their agents, and their collaborators. Moreover, even these actors receive the protection of the warrant requirement if the government is primarily attempting to put together a criminal prosecution. Thus, the executive can proceed without a warrant only if it is attempting primarily to obtain foreign intelligence from foreign powers or their assistants. We think that the unique role of the executive in foreign affairs and the separation of powers will not permit this court to allow the executive less on the facts of this case, but we also are convinced that the Fourth Amendment will not permit us to grant the executive branch more.

B. *Reasonableness of the Surveillance*

■ Even if a warrant is not required, the Fourth Amendment requires that the surveillance be "reasonable." The reasonableness of the surveillance is determined by examining the circumstances of the particular case. *Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978).

■ For seventy days prior to July 20, FBI agents intercepted all of Truong's phone calls; and, for almost as long a period, the agents listened to Truong's conversations with visitors in his apartment.[6] As the district court observed, the surveillance was nonetheless reasonable, and we agree.

The purpose of the surveillance was to determine Truong's source or sources for government documents. Thus, it was necessary to intercept all his calls, because the government agents could never be sure whether a particular caller would reveal

---

5. As Attorney General Bell testified at the hearing on the motion to suppress the fruits of the surveillance: "Let me say that every one of these counterintelligence investigations involved, nearly all of them that I have seen, involves crime in an incidental way. You never know when you might turn up with something you might want to prosecute."

6. The FBI surveillance continued for over 260 days. Because the district court suppressed all evidence obtained from the surveillance after July 20, only the seventy-day period preceding that date is relevant. The district court also ruled that the blanket surveillance after July 20 was unreasonable, because the government had succeeded in identifying Humphrey as the sole source of the documents by that date.

that he was a source of the documents sometime during his conversation with Truong. As well, when the government eavesdrops on clandestine groups like this one, investigators often find it necessary to intercept all calls in order to record possible code language or oblique references to the illegal scheme. *See United States v. Clerkley*, 556 F.2d 709 (4 Cir.1977), *cert. denied sub nom. London v. United States*, 436 U.S. 930, 98 S.Ct. 2830, 56 L.Ed.2d 775 (1978) (approving blanket surveillance of numbers operation in order to determine the participants). Thus, on the facts of this case, the surveillance conducted by the government agents was reasonable.[7]

### C. *Package Search*

■ The FBI and the CIA searched one of the packages Truong sent to Paris by Krall without either the authorization of the Attorney General or a search warrant. Because the government agents did not receive executive authorization, the foreign intelligence exception to the warrant requirement does not legitimate this search. Nevertheless, because Truong did not have a legitimate expectation of privacy in the package, *see United States v. Rabinowitz*, 339 U.S. 56, 65–66, 70 S.Ct. 430, 435, 94 L.Ed. 653 (1950), the district court did not err in permitting the contents of the package to be admitted into evidence.

The package of documents was contained within an unsealed manila envelope. Inside the envelope was a transparent bookbag, loosely tied with twine. Although the documents were partially shielded from view by opaque pieces of paper, some parts of the documents could be seen through the bookbag. Thus, Truong had not made a diligent effort to conceal the documents from view.

Moreover, Truong knew that this flimsily wrapped package would cross at least two national boundaries on its way to Paris. This risk of inspection when Krall left the United States and when she entered France militates against any expectation of privacy by Truong. *See United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). Therefore, because the package was poorly wrapped and because it was destined for foreign delivery, Truong could not have harbored a reasonable expectation that the contents of the package would remain undisclosed; and consequently neither a search warrant nor executive authorization was necessary for this search.[8]

### III.

The defendants were convicted of several violations of the espionage statutes and related provisions. Truong and Humphrey raise a number of challenges to these convictions.

### A. *Espionage Statutes*

The jury found that the defendants had violated three espionage provisions, 18 U.S.C. § 794(a), § 794(c), and § 793(e). Two principal objections are made by the defendants to their convictions under these statutes, and we will consider them in order:

#### (1) *National Defense*

■ A common prerequisite for a conviction under each of the statutes is that the defendant transmit information "relating to the national defense." The defendants argue that this phrase limits the reach of the statutes to military matters and assert that none of the materials transmitted by

---

7. In addition to the surveillance of Truong, the government installed a secret video tape camera in Humphrey's office at the United States Information Agency. In his brief, Humphrey does not discuss this intrusion at length, perhaps because the evidence obtained from the video tape did not play an important role at trial. In any case, we affirm the ruling of the district court that the video-taping was reasonable up to July 20, because the FBI took steps to minimize the intrusion and because the tap-

ing was necessary to determine how Humphrey handled government documents while at work.

8. A letter and another package were searched without a warrant but with executive authorization. Because both of those searches took place before July 20, in accordance with our resolution of the issue of a foreign intelligence warrant exception, we conclude that neither of these warrantless searches violated the Fourth Amendment.

Truong and Humphrey related to the "national defense" thus defined.

Contrary to the defendants' argument, the legislative history of the espionage statutes demonstrates that Congress intended "national defense" to encompass a broad range of information and rejected attempts to narrow the reach of the statutory language. *See* Edgar and Schmidt, The Espionage Statutes and Publication of Defense Information, 73 Colum.L.Rev. 929, 972–74 (1973). Resting on a similar reading of the intent of Congress, the Supreme Court in *Gorin v. United States*, 312 U.S. 19, 28, 61 S.Ct. 429, 434, 85 L.Ed. 488 (1941), underscored the breadth of "national defense" as used in the espionage statutes: "National Defense, the Government maintains, 'is a generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness.' We agree that the words 'national defense' in the Espionage Act carry that meaning." Thus, the defendants' attempt to constrict the ambit of "national defense" to strictly military matters cannot succeed. *See United States v. Boyce*, 594 F.2d 1246 (9 Cir.1979), *cert. denied*, 444 U.S. 855, 100 S.Ct. 112, 62 L.Ed.2d 73 (1980).

Under either the strict definition urged by the defendants or the broad definition endorsed by the Supreme Court in *Gorin*, the defendants transmitted information which related to the national defense. The materials sent to Paris included information which related directly to the United States military, including information about Vietnamese designs on Thailand, American POW's in Indochina, and American military materiel which had fallen into the hands of the Vietnamese government. In addition, under the broader definition of national defense, the packages contained a great deal of national defense information, in the form of names of United States sources for intelligence about the Vietnamese government. On the facts of this case, there can be no doubt that the information transmitted was information "relating to the national defense." [9]

### (2) *Intent*

■ The defendants base their second principal objection upon their claim that a constitutional conviction under the espionage statutes must include a finding of evil intent, *i. e.*, intent to injure the United States or to aid a foreign nation. They contend that their convictions under § 794(a) and § 794(c) are invalid because the trial judge failed to instruct the jury that a finding of evil intent was essential and that their convictions under § 793(e) are invalid because § 793(e) itself does not contain evil intent as an element necessary for a conviction.

Under § 794(a) and § 794(c), the prosecution must prove that the defendant acted "with intent or reason to believe" that transmission of the information will injure the United States or aid a foreign nation. This scienter requirement is critically important, because the Supreme Court relied upon it in *Gorin*, 312 U.S. at 26–27, 61 S.Ct. at 433–434 (1941), to rebut a claim that the espionage statutes were unconstitutionally overbroad. The defendants insist that the district judge's instructions in this case diluted the important scienter requirement by suggesting that the defendant could be con-

---

9. The defense raises another challenge to the espionage convictions based upon the district court's instruction on classification of documents. An examination of the instruction reveals, however, that it was entirely proper. First, the district judge informed the jury that it might "consider the testimony that the documents were classified." Certainly the classification of the documents was relevant to the question of whether they related to the "national defense." *See United States v. Dedeyan*, 584 F.2d 36, 40 41 (4 Cir.1978). Second, the district judge correctly instructed the jury that the official nature of the documents would be pertinent to whether their transmission would injure the United States or aid a foreign nation. Finally, the jury was told that the defendants would not be guilty of transmitting national defense information if the information were available in the public domain. Thus, the district court did not place too great an emphasis on the classification of the documents or their official nature and specifically instructed the jury that transmission of publicly available information did not fall within the statutory prohibitions.

victed for mere negligence. This contention is insubstantial.

The district judge instructed the jury that to convict defendants it must find that they acted "willfully and with an intent *or* reason to believe" that the information would be used to injure the United States or to aid a foreign power. The jury was also told that "reason to believe" meant that a defendant must be shown to have known facts from which he concluded or reasonably should have concluded that the information could be used for the prohibited purposes. The latter did not mean, however, that the jury could convict merely upon a finding that a defendant acted "negligently." Rather, the jury was instructed that a defendant must act "willfully" which the jury was told meant "voluntarily and intentionally and with a specific intent to do something the law forbids."

Section 793(e) does not contain the same strong scienter language of § 794(a). Rather, it requires only that the defendant have "reason to believe" that the national defense information could be used to harm the United States or to aid a foreign nation. The defendants contend that this less stringent language renders the statute unconstitutionally overbroad. *See generally* Edgar & Schmidt, *supra*, at 998–1020.

Even though § 793(e) does not include scienter language identical to the language of § 794(a), it does require that the accused "willfully" transmit the information. Evidently relying upon this language, the trial judge instructed the jury that it must find that the defendants acted in bad faith be-

fore it could convict, and defined bad faith as a "design to mislead or deceive another. That is, not prompted by an honest mistake as to one's duties, but prompted by some personal or underhanded motive." This instruction more than cured any possible overbreadth of § 793(e).[10] *See Gorin v. United States,* 312 U.S. 19, 27–28, 61 S.Ct. 429, 433–434, 85 L.Ed. 488 (1941); *United States v. Dedeyan,* 584 F.2d 36 (4 Cir. 1978); Edgar & Schmidt, *supra,* at 1020.[11]

### B. *Espionage-Related Statutes*

In addition to their convictions under the espionage statutes, Truong and Humphrey were found guilty of violating two related criminal statutes, 18 U.S.C. § 951 and 50 U.S.C. § 783(b) and (c).

#### (1) *Foreign Agent*

■ The jury found that Truong and Humphrey had acted in the United States as unregistered agents of the Socialist Republic of Vietnam, a violation of 18 U.S.C. § 951. The defendants make two challenges to their convictions. First, they argue that the statute violated their privilege against self-incrimination because they would have been forced to confess participation in illegal espionage if they had registered. A registration provision violates the Fifth Amendment, however, only if it is directed at a class of persons who are inherently suspect of illegal activities. A neutral registration requirement, such as this one directed at representatives of foreign nations, does not offend the Fifth Amendment. *See United States v. Walden,* 411

---

**10.** Section 793(e) contains another possible ambiguity. It punishes only those who have "unauthorized possession" of national defense information. The trial judge provided adequate content for this phrase by advising the jury that a person would have authorized possession if he had an appropriate security clearance and if he gained access to the document because it was necessary to the performance of his official duties.

**11.** Defendants make two other objections to the espionage convictions which we find without merit. Contrary to the defendant's contention, venue for § 794(a) and § 793(e) charges was properly laid in the Eastern District of

Virginia. Even though Humphrey gave Truong the documents in the District of Columbia, Truong passed them to Krall in Alexandria, Virginia. Since Krall was the means by which the documents were carried to the Vietnamese in Paris, the proscribed act, the act of transmission, took place in Alexandria. *See United States v. Walden,* 464 F.2d 1015 (4 Cir.), *cert. denied,* 409 U.S. 867, 93 S.Ct. 165, 34 L.Ed.2d 116 (1972).

Finally, the district court included all the elements of the espionage offenses in its charge and did not include only two elements as the defendants insist.

F.2d 1109 (4 Cir.), *cert. denied*, 396 U.S. 931, 90 S.Ct. 271, 24 L.Ed.2d 230 (1969).

 The defendants also contend that § 951 is impermissibly vague and overbroad. Their principal objection is to the word "agent." "Agent" as used in this context, however, is a readily understandable term which provides adequate notice of the conduct proscribed by the statute.

#### D. *50 U.S.C. § 783(b) and (c)*

Truong and Humphrey were convicted of conspiracy to violate 50 U.S.C. § 783(b) and (c). Section 783(b) makes it unlawful for a United States government employee knowingly to communicate classified information to an agent of a foreign government. Conversely, § 783(c) makes it illegal for an agent of a foreign government knowingly to receive classified information from a United States government employee. The defendants contest their convictions under this statute on several grounds.

 Most of their contentions were answered adequately in *Scarbeck v. United States*, 317 F.2d 546 (D.C.Cir.1962), *cert. denied*, 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077 (1963). Truong argues that he cannot be bound by the classification system because he was not a government employee. But he cannot hide behind his civilian status when he encouraged a government employee to copy classified documents. Second, contrary to Truong's argument, the fact that the President did not personally classify the documents does not place them outside the scope of the statute. Finally, we find no unconstitutional ambiguity in the phrase "of a kind which shall have been classified" or in "agent or representative of a foreign government."

#### IV.

Defendants made several objections at trial regarding the district court's application of the Jencks Act and assert them on appeal. Two of those objections merit extended discussion.

#### A. *The Final Group of Documents*

Robert Hall was Krall's CIA case officer. He made reports of his conversations with Krall. Near the end of trial, the prosecution presented the district judge with a large number of Hall's reports and cables concerning his conversations with Krall. Because the government produced the material at a late date and because there was a large number of documents, the district judge was candid in stating that he was unable to examine them adequately. He said: "I have been through it in a cursory manner, enough to determine that there is nothing . . ., in very cursory reading [that] is any different than [Jencks Act material already supplied to the defense]." The judge revealed his irritation with the prosecution for producing the documents tardily and thereby preventing him from fully carrying out his responsibilities: "Presuming the Court [evidently the Fourth Circuit] finds to the contrary, the Government is going to lose this case just because somebody in the CIA was being cute."

 As these statements of the district judge reflect, there is no clear finding, on the existing record, of whether the last group of documents contained statements which should have been produced under the Jencks Act. They were not given the careful scrutiny the district court felt was necessary to make a confident decision. However, we decline the district judge's invitation to inspect the documents ourselves, and, instead, remand the case so that the district court can carefully screen the documents. We leave this task to the district judge because the district courts, not the appellate courts, are entrusted with the duty of examining documents for Jencks Act material, *Campbell v. United States*, 373 U.S. 487, 493, 83 S.Ct. 1356, 1360, 10 L.Ed.2d 501 (1963) (*Campbell II*). In addition, since the district judge is intimately familiar with the other Jencks Act material produced at trial, he is better equipped than we to decide whether any Jencks Act statements included within the documents are merely cumulative so that the failure to produce them at trial was not prejudicial to the defendants.

The need for a remand in this case is underscored by the fact that the government has conceded in its brief before us that the documents contain perhaps three Jencks Act statements by Krall. The government's description of one of these statements suggests that one of Krall's conversations with Hall may have differed from her testimony at trial. Krall testified that Phan Thanh Nam, the head of the Vietnamese Paris mission, told her that Truong was among "our people in Washington." The government states in its brief that Hall's report recounts Krall's conversation with Nam without mentioning a reference to Truong. This document could thus contain a Jencks Act statement which might have been used to impeach Krall's testimony.

We do not pass judgment, however, on the significance of the government's failure to produce this possible Jencks Act statement. We leave that decision to the "good sense and experience of the district judge", *Palermo v. United States*, 360 U.S. 343, 353, 79 S.Ct. 1217, 1225, 3 L.Ed.2d 1287 (1959). If the district court decides that the documents do not contain Jencks Act material, or if the district court finds Jencks Act material but decides that the prosecution's failure to produce it was harmless error,[12] the district court should enter a new judgment of conviction. If, however, the district court finds Jencks Act material and concludes that denial of it was not harmless error, it should vacate the judgments of conviction in order that the defendants may obtain a new trial. *See Goldberg v. United States*, 425 U.S. 94, 111–12, 96 S.Ct. 1338, 1348–1349, 47 L.Ed.2d 603 (1976).

### B. *Destruction of Krall's Reports*

Krall made some written reports to Hall detailing her activities while in Paris. These reports included descriptions of her actions relating to Truong. At trial, defendants attempted to obtain these reports, under 18 U.S.C. § 3500(e)(1), in order to test Krall's courtroom description of the Paris incidents. The prosecution was unable to produce Krall's reports, however, because Hall had destroyed them according to routine CIA procedures before any criminal prosecution was contemplated. The defendants argue that the district court should have imposed sanctions upon the prosecution for the destruction of the reports by the CIA.

The destruction of Jencks Act material may violate at least the spirit of the Act, even if the material is destroyed without bad faith following a routine procedure. *See United States v. Missler*, 414 F.2d 1293, 1304–05 (4 Cir. 1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970); *United States v. Johnson*, 337 F.2d 180, 201–02 (4 Cir. 1964), *aff'd*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966). Whatever the Jencks Act consequences of the destruction of "statements" by criminal investigators, the Jencks Act was not violated in this case, because the reports were destroyed outside the context of a criminal investigation.

Krall acted as both an FBI agent and a CIA agent. As a CIA operative, she provided a variety of information regarding the Vietnamese government, not limited to the flow of documents from Truong to Paris. Her reports to Hall, her CIA case officer, were part of her intelligence-gathering function for the CIA. The reports were destroyed by Hall, acting as a CIA intelligence functionary, in accordance with CIA practice designed to preserve the secrecy of sensitive foreign operations. Krall's reports were thus prepared and destroyed in conjunction with her role as an intelligence agent, not as an aspect of her role as an informer in a criminal investigation. Therefore, even under the decisions of those courts which have imposed sanctions for routine destruction of Jencks Act statements by criminal investigators, *see, e. g.*, *United States v. Carrasco*, 537 F.2d 372 (9 Cir. 1976), the prosecution would not be

---

**12.** The district court will, of course, be strict in its application of harmless error doctrine to any nonproduction of Jencks Act material. *See* *Goldberg v. United States*, 425 U.S. 94, 111 n.21, 96 S.Ct. 1338, 1348 n.21, 47 L.Ed.2d 603 (1976).

subject to sanctions for the destruction of Krall's reports. In this case, the district court did not err when it refused to impose sanctions on the prosecution for the destruction of this possible Jencks Act material.[13]

## V.

■ The defendants were also convicted of violating 18 U.S.C. § 641. That statute renders criminally liable any person who "converts to his use or the use of another, or without authority, sells, conveys or disposes of any . . . thing of value of the United States." The defendants were convicted under this statute on the theory that they converted government property in the form of classified information when they surreptitiously secured copies of secret documents in the possession of the United States Information Agency.

The defendants argue that their convictions must be reversed because the theft of classified information falls outside the confines of this statute. They contend that information cannot be "converted" because the common law tort of conversion requires that the legitimate owner be deprived of possession, see *Pearson v. Dodd*, 410 F.2d 701 (D.C.Cir.), *cert. denied*, 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969). In this case, the defendants did not "convert" the classified information by copying the documents, their theory goes, since the United States Information Agency was not denied access to its information in the process. Furthermore, the defendants assert, information is an intangible not encompassed by § 641, which speaks of tangible "things" of value.[14] Therefore, the defendants conclude that, because they obtained an intangible incapable of conversion, their acts were not prohibited by the limited terms of § 641.

For reasons set forth in the separate opinion of Judge Russell in which Judge Hall concurs, the majority has concluded that, under the concurrent sentence rule, this contention of the defendants should not be considered. I think otherwise, and I will state first my reasons why I think the concurrent sentence doctrine should not be invoked to bar review and next my views with respect to the merits of defendants' contention.

Whatever the continuing vitality of the concurrent sentence doctrine in other circuits, I thought that it was decently interred in this circuit by the decision in *Close v. United States*, 450 F.2d 152, 155 (4 Cir. 1971), *cert. denied*, 405 U.S. 1068, 92 S.Ct. 1513, 31 L.Ed.2d 799 (1972), where we said "there is no legal reason why a concurrent sentence, attached to a longer, valid sen-

**13.** We reject two other Jencks Act claims raised by the defendants. First, the defendants contend that the district judge should have held a hearing under *Campbell v. United States*, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961). (*Campbell I*), to determine whether documents prepared by Hall contained Jencks Act statements of Krall. Unlike the situation in *Campbell I*, in this case there was no need for a hearing to gather extrinsic evidence in order to determine whether Hall's reports contained "statements." Because Hall sometimes used quotation marks in his reports, the defense suggested that Hall's reports amounted to a "substantially verbatim recital" of Krall's comments to him. 18 U.S.C. § 3500(e)(2). By reading the reports and examining the context in which the quotation marks were used, the district judge could determine on his own whether the quotation marks enclosed Krall's exact words or whether the quotation marks were used by Hall merely as literary devices. Here, then, no hearing was necessary.

Second, the defendants argue that the district judge withheld Jencks Act material from them because it was classified. Although the district judge commented that there was "a little more burden" in this case than the usual Jencks Act case because the documents were classified, he did not employ a standard that would deny the defendants information to which they were entitled under the Jencks Act. Rather, he indicated by his comments only that he applied the Jencks Act in this instance more strictly than he would in the ordinary case. In fact, the district judge admitted that he had "turned over things arguably useful though repetitious."

**14.** One case has limited § 641 to tangibles. *Chappell v. United States*, 270 F.2d 274 (9 Cir. 1959). That case held that an Air Force officer did not violate § 641 by appropriating the labor of an airman while on duty, because the airman's labor was an intangible outside the scope of § 641.

tence, and already served, and based on what must fairly be deemed constitutionally impermissible evidence, should be left standing and we direct that it be vacated." If this was true when the litigation was a collateral attack on a conviction, the sentence for which had been fully served, I think it much more true here where the validity of the conviction is before us on direct appeal and the sentence is as yet unserved. That the defect in the conviction in *Close* was constitutional while here the claimed defect is statutory is, to me, a distinction without a difference. And I am not alone in my reading of *Close*. It has been so read as conclusively rejecting the concurrent sentence doctrine in *United States v. Vargas*, 615 F.2d 952, 957 (2 Cir. 1980), and in Note, The Concurrent Sentence Doctrine After *Benton v. Maryland*, 7 U.C.L.A.—Alaska L.Rev. 282, 294, 306 (1978). Indeed, what was decided in *Close* is so clear that I am led to question the authority of the majority of this panel to overrule the decision of a previous panel of this court. Heretofore such a change of direction, absent a supervening superseding decision of the Supreme Court, has been restricted to an in banc court.

But even if the doctrine has continuing utility as a means of avoiding the expenditure of judicial resources on the unnecessary decision of an issue, I think that it is improper to invoke it here for at least two reasons. First, as the government has sought to apply § 641, there is in issue not merely the defendants' guilt or innocence, but, as I later demonstrate, substantial first amendment considerations. In my view, proper concern for the protection of these important considerations should make us more hesitant to invoke the concurrent sentence doctrine here than in the run-of-the-mill criminal case.

Second, this is not a case in which defendants' other convictions are unqualifiedly affirmed. To the contrary, we are unanimous in remanding the case to the district court for consideration of whether Jencks Act material was improperly denied the defendants with the direction that, if such a denial is found and determined to be prejudicial,

defendants must be tried anew. Defendants' guilt of the other offenses, then, has not been finally settled. Should there be a new trial, manifestly that trial should be limited to the counts of the indictment not based on § 641 if there is merit in defendants' contention as to the limited scope of § 641. We should avoid the risk of any error in the § 641 aspect of the case which might have a prejudicial effect on the validity of other possible convictions. While I am generally in agreement with the dissenting view in *United States v. Boyce*, 594 F.2d 1246, 1252 (9 Cir. 1979), *cert. denied*, 444 U.S. 855, 100 S.Ct. 112, 62 L.Ed.2d 73 (1980) rather than that of the majority in that case, the instant case is even a stronger one in which to reject application of the concurrent sentence doctrine. Here, the validity of the convictions under § 641 is a real issue and not an academic exercise having no practical effect as the majority tries to demonstrate.

When brought to the merits of defendants' contention, my views are as follows:

The legislative history of § 641 does not mention the application of the statute to the theft of government information. Section 641 is a venerable criminal provision; its predecessors were first enacted in 1875. The statute was codified in its present form in 1948 when the criminal code was revised. As might be expected, the 19th century legislative history of the predecessor statutes does not address the application of the statute to government information, almost certainly because a Congress of that era would not foresee this issue. *See United States v. Lambert*, 446 F.Supp. 890, 893 (D.Conn.1978), *aff'd sub nom. United States v. Girard*, 601 F.2d 69 (2 Cir. 1979). And, because the 1948 revision was merely a consolidation of several provisions of the 1940 code, Congress did not discuss the substantive reach of § 641 when the statute was enacted in its current form. In short, the legislative history reveals that Congress has never directly considered the application of § 641 to government information. In enacting § 641 and its predecessors, Congress did not express an intent that the

unauthorized disclosure of government information be either included within or excluded from the criminal prohibitions of § 641.

While the legislative history of the statute is inconclusive, the language of the statute and the leading Supreme Court decision dealing with § 641 establish that the statute should not be construed as narrowly as the defendants would like. The language of § 641 itself is all-inclusive. By appending "thing of value" onto the list of "any record, voucher, [or] money," Congress certainly did not evince an intent to restrict the reach of § 641. Nor did Congress manifest a desire that § 641 not include some wrongful appropriations of government property when it chose the phrase "embezzles, purloins, or knowingly converts . . . , or without authority, sells, conveys or disposes."

In *Morissette v. United States*, 342 U.S. 246, 271, 72 S.Ct. 240, 254, 96 L.Ed. 288 (1952), the Supreme Court confirmed that Congress intended the language of § 641 to sweep broadly:

> What has concerned codifiers of the larceny type offense is that gaps or crevices have separated particular crimes of this general class and guilty men have escaped through the breaches. The books contain a surfeit of cases drawing fine distinctions between slightly different circumstances under which one may obtain wrongful advantages from another's property. The codifiers wanted to reach all such instances.[15]

Likewise, in an earlier footnote, the Court explained: "The history of § 641 demonstrates that it was to apply to acts which constituted larceny or embezzlement at common law and also acts which shade into those crimes but which, most strictly considered might not be found to fit their fixed definitions." 342 U.S. at 266 n.28, 72 S.Ct. at 253 n.28. Thus, the legislative design as revealed by the language of the statute and by *Morissette* belies the defendants' attempt to narrow the statute to the taking of certain categories of property and to engraft upon § 641 the technical definition of the tort of conversion. *See United States v. Girard*, 601 F.2d 69 (2 Cir. 1979), aff'd *United States v. Lambert*, 446 F.Supp. 890 (D.Conn.1978).[16]

While I would thus conclude that in some circumstances § 641 may encompass the unauthorized disclosure of government information, § 641 must be applied to the theft of government information with extreme care. Two particularly acute problems arise when the statute is used to punish defendants who have stolen government information.

First, because the statute was not drawn with the unauthorized disclosure of government information in mind, § 641 is not

---

**15.** Another passage conveys similar thoughts: "The purpose which we here attribute to Congress . . . demonstrates that the serious problem in drafting such a statute is to avoid gaps and loopholes between offenses." 342 U.S. at 272 73, 72 S.Ct. at 254.

In the first part of the opinion, the Court held that Congress did not intend to omit criminal intent as an element of the crime proscribed in § 641 by failing to include an explicit mention of criminal intent. The Court concluded that Congress must have been aware that the criminal acts listed in § 641 had at common law always included criminal intent as an essential element and that therefore the Court would not infer that Congress had deleted criminal intent as an element of the crimes. 342 U.S. at 263, 72 S.Ct. at 249. This holding that Congress meant to include the critical element of criminal intent when it codified these common law crimes does not undercut the Court's separate holding that Congress intended to criminalize a broad range of wrongful takings, beyond the confines of the common law, which were committed with criminal intent.

**16.** *See also United States v. Friedman*, 445 F.2d 1076 (9 Cir.), *cert. denied sub nom. Jacobs v. United States*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971). One district court has concluded that § 641 does not include the unauthorized copying of government documents. *United States v. Hubbard*, 474 F.Supp. 64, 79–80 (D.D.C.1979) (dicta).

Courts which have interpreted other criminal statutes containing phrases similar to "thing of value" have decided that the statutory language included both tangible and intangible property. *See, e. g., United States v. Zouras*, 497 F.2d 1115 (7 Cir. 1974); *United States v. Bottone*, 365 F.2d 389 (2 Cir.), *cert. denied*, 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966).

carefully crafted to specify exactly when disclosure of government information is illegal. The crucial language is "without authority." The precise contours of that phrase are not self-evident. This ambiguity is particularly disturbing because government information forms the basis of much of the discussion of public issues and, as a result, the unclear language of the statute threatens to impinge upon rights protected by the first amendment. Under § 641 as it is written, no precise standard controls the exercise of discretion by upper level government employees when they decide whether to forbid or permit the disclosure of government information. *See* Nimmer, National Security Secrets v. Free Speech: The Issues Left Undecided in the Ellsberg Case, 26 Stan.L.Rev. 311, 322 (1974). Consequently, upper level government employees might use their discretion in an arbitrary fashion to prevent the disclosure of government information; and government employees, newspapers, and others could not be confident in many circumstances that the disclosure of a particular piece of government information was "authorized" within the meaning of § 641. Thus, the vagueness of the "without authority" standard could pose a serious threat to public debate of national issues, thereby bringing the constitutional validity of § 641 into question because of its chilling effect on the exercise of first amendment rights. *See Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).[17]

The government responds to this first amendment concern by insisting that "without authority" has very specific content when § 641 is applied to the disclosure of classified information. When a defendant is charged with stealing classified information, the government submits, "without authority" means that the defendant failed to comply with the regulations governing disclosure of classified information. Because those regulations are highly detailed and specific, the government concludes, "with-

out authority" is not a vague standard in the context of classified information.

The Second Circuit has recently adopted the approach advocated by the government when it ruled on the application of § 641 to another category of government information. In *United States v. Girard,* 601 F.2d 69 (2 Cir. 1979), *aff'g United States v. Lambert,* 446 F.Supp. 890 (D.Conn.1978), the defendants were charged with selling information obtained from the computers of the Drug Enforcement Administration including the identities of informants and the status of government drug investigations. The court determined that § 641 encompassed the unauthorized disclosure of government information. The court also confronted the vagueness and the resulting first amendment difficulties contained within the statute. The court corrected these defects by reading "without authority" to embody the pertinent Justice Department regulations and the Agents Manual of the Drug Enforcement Administration, which specifically forbade the disclosure of the government information at issue in that case. By thus reasonably looking to the concrete definition of "without authority" that governed the disclosure of a particular category of government information, the court eliminated the vagueness of § 641 as applied to the defendants in that case.

This solution for the vagueness of § 641 raises the second of the problems which is caused by the application of § 641 to the theft of government information: the potential for conflict between § 641 and other statutes specifically addressed to the disclosure of government information. Section 641 has not been traditionally employed to punish those who make unauthorized disclosures of government information. In fact, the decision of the Second Circuit in *Girard,* handed down in 1979, was the first circuit decision to face the issue squarely and apply the statute to the theft of government information. Earlier, without much discus-

---

**17.** Of course, I express no opinion whether § 641 as applied to classified information would in fact violate the first amendment. I merely note the apparent first amendment difficulties

raised by the vagueness of the statute when it is applied to the theft of government information.

sion, the Ninth Circuit had permitted a defendant to be convicted under § 641 for disclosing grand jury information. *United States v. Friedman*, 445 F.2d 1076 (9 Cir.), *cert. denied*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971). Because Congress was never consciously aware that § 641 would punish the unauthorized disclosure of government information and because this use of § 641 is a relatively recent innovation, courts must be cautious in interpreting § 641 so that it is applied in a manner consistent with the congressional design, if any, expressly governing the disclosure of a particular type of government information.

When the statutes addressed to the disclosure of classified information are examined, it becomes apparent that § 641 cannot, consistent with the congressional framework of criminal statutes explicitly directed at classified information, be applied to punish these defendants for the unauthorized disclosure of classified information.

Congress has legislated frequently and with precision with regard to the unauthorized disclosure of classified information, and it has chosen to punish only certain categories of disclosures and defendants. National defense information is protected from disclosure by the espionage statutes, particularly § 793(a), (b), (c) and § 794. But those statutes only penalize a defendant who acts "with intent or reason to believe that [the information will be used] to the injury of the United States or to the advantage of [a] foreign nation." [18] Classified information is also guarded from unauthorized disclosure by 18 U.S.C. § 798. Section 798 does not contain the strict intent requirement of the espionage statutes; it punishes anyone who acts "knowingly and willfully". But, § 798 makes criminal the disclosure of only one class of classified information, classified information concerning cryptography and communications. By contrast, 50 U.S.C. § 783(b) makes it unlawful to disclose any classified information. That statute, however, places this strict prohibition only upon government employees,[19] and subjects even government employees to criminal penalties only when the information is communicated to an agent of a foreign government or a member of a Communist organization.[20]

If § 641 were extended to penalize the unauthorized disclosure of classified information, it would greatly alter this meticulously woven fabric of criminal sanctions. Unlike the espionage statutes, § 641 does not contain a stringent intent requirement; it penalizes whomever "embezzles, steals, purloins, or knowingly converts." And, unlike § 798, § 641 would not penalize the disclosure of only a limited category of classified information. Rather, § 641 would outlaw the unauthorized disclosure of any "thing of value", that is, any classified information. Finally, in contrast to 50 U.S.C. § 783(b), the penalties of § 641 would not be placed only on government employees who communicate classified information to foreign agents or Communist operatives. Instead, § 641 would punish all persons; "whoever" disclosed classified information without authority would be subject to criminal penalties.

**18.** Two of the espionage statutes appear to reach much further, and, on first reading, seem to penalize the merely willful disclosure of most classified information. 18 U.S.C. § 793(d) and (e). It has been suggested that Congress did not intend these statutes to have such a broad meaning. *See* Edgar & Schmidt, The Espionage Statutes and Publication of Defense Information, 73 Colum.L.Rev. 929, 1031-57 (1973). I would not need to decide exactly how far these statutes extend. I would need only to hold that, whatever the precise scope of § 793(d) and (e), the general terms of § 641 should not be employed to serve as a broad prohibition against the authorized disclosure of classified information when Congress has chosen to enact a series of criminal statutes directly aimed at classified information.

**19.** *See also* 50 U.S.C. § 783(c), the counterpart of § 783(b), which punishes a foreign agent or member of a Communist organization who receives classified information from a government employee.

**20.** *See also* 18 U.S.C. § 793(f), which punishes anyone, "being entrusted with or having lawful possession" of national defense documents, who (1) permits them to be destroyed through gross negligence or (2) fails to report their illegal removal from proper custody.

Thus, if § 641 were extended to the unauthorized disclosure of classified information, it would sweep aside many of the limitations Congress has placed upon the imposition of criminal sanctions for the disclosure of classified information. Section 798 and 50 U.S.C. § 783(b) would be effectively subsumed under the broad language of § 641.[21] In addition, any person who willfully disclosed any classified information without authority would be subject to criminal penalties, contrary to the evident intent of Congress expressed in the strict intent requirement inserted into the espionage statutes. It is axiomatic that statutes dealing with the same topic should be read in pari materia in order to further the overall legislative intent expressed in a series of statutes, see 2A Sutherland, Statutory Construction § 57.06 (4th ed. 1973), and that axiom is even more forceful in the sensitive area of classified information which has been the subject of frequent congressional concern. Because § 641 would disturb the structure of criminal prohibitions Congress has erected to prevent some, and only some, disclosures of classified information, the general anti-theft statute should not be stretched to penalize the unauthorized disclosure of classified information.[22]

My conclusion is reinforced by the fact that Congress has repeatedly refused to enact a statute which would make criminal the mere unauthorized disclosure of classified information. The present espionage statutes were enacted largely in their

---

**21.** When it enacted § 798, Congress certainly did not conceive that § 641 would prevent the unauthorized disclosure of classified information. In fact, the House Report assumed that, other than the predecessor of § 798, the espionage statutes were the only criminal statutes which protected classified information. The House Report explained that the espionage statutes did not provide sufficient protection for classified communications information because under the espionage statutes, "unauthorized revelation of information of this kind can be penalized only if it can be proved that the person making the revelation did so with an intent to injure the United States." H.R.Rep. No.1895, 81st Cong., 2d Sess. (1950), *reprinted in* [1950] U.S.Code Cong.Serv., pp. 2297, 2298. The Report went on to note that former government employees would not be subject to penalties for disclosing classified communications information:

> During the recent war there were many persons who acquired some information covered by this bill in the course of their duties. Most of these individuals are no longer connected with the services and are not now prohibited from making disclosures which can be most damaging to the security of the United States. They are subject to the temptations of personal gain and of publicity in making sensational disclosures of the personal information within the purview of this act. *Id.*

The Report described the congressional response to this security threat by emphasizing the limited nature of the criminal prohibition embodied in § 798:

> This bill makes it a crime to reveal the methods, techniques, and material used in the transmission by this Nation of enciphered or coded messages. It does not control in any way the free dissemination of information which might be transmitted by code or cipher.
> *Id.*

Thus, in 1950 Congress felt that, after it enacted § 798, the criminal code would contain two prohibitions against the unauthorized disclosure of classified information: the espionage statutes, which are constricted by their intent requirement, and § 798, which protected one narrow category of classified information. It would greatly disrupt the network of carefully confined criminal prohibitions Congress thought it had enacted in 1950, a network which has remained largely unchanged until the present day, if the courts permitted § 641 to serve as a criminal prohibition against the merely willful unauthorized disclosure of any classified information.

**22.** I also note that currently Congress is debating an addition to the criminal code which would make it unlawful for certain persons to disclose another category of classified information, the names of covert agents serving the United States intelligence agencies. *See* S. 2284, 96th Cong., 2d Sess. § 701 (1980). According to the sponsor of the Senate bill, this proposed statute would punish only those who have had authorized access to the classified information. The authors of the bill felt that they "should concentrate [their efforts] on those who have abused their trust" because of "reasons relating to constitutional considerations." 126 Cong.Rec. S. 1306 (daily ed. February 8, 1980) (remarks of Sen. Huddleston). If § 641 were applied to classified information, as the government urges in this case, this congressional debate would be to a great extent moot, because § 641 would punish anyone who disclosed any classified information, including the names of covert agents.

present form in 1917 at the request of President Wilson. Although Congress agreed to statutes aimed at espionage, it specifically rejected the request of the President that it enact a criminal statute to punish the publication of defense information in violation of presidential regulations. Concern for public debate of defense issues and distrust of a war-time president's powers converged to defeat the proposal to criminalize the publication of classified information. Edgar & Schmidt, *supra,* at 940–41. Similar attempts were unsuccessful immediately after World War II, in the late 1950's, in the mid 1960's, and in the 1970's.[23] *See* Subcomm. on Secrecy and Disclosure of the Senate Select Comm. on Intelligence, 95th Cong., 2d. Sess., National Security Secrets and the Administration of Justice 17–19, 22 (Comm. Print 1978). Thus, in the area of national security information, Congress has consciously refrained from making it a crime merely to disclose classified information without authority.

In sum, because a criminal prohibition against the unauthorized disclosure of classified information would be inconsistent with the existing pattern of criminal statutes governing the disclosure of classified information and because Congress has al-ways refused to enact a statute like § 641 applicable to the disclosure of classified information, I would hold that § 641 cannot be interpreted to punish the unauthorized disclosure of classified information. Like the district court in *Lambert,* 446 F.Supp. at 899, I would conclude that the application of § 641 to thefts of government information should be decided upon a case-by-case basis. Here, where the unauthorized disclosure of classified information has been the focus of legislation and constitutional and political debate within Congress, it would be unwise to extend § 641 through judicial interpretation to include this category of information. Whatever the content of "thing of value" in the context of other types of government information, this phrase may not be read to include classified information within § 641.[24]

## VI.

The Vietnamese ambassador to the United Nations was named in the indictment of Truong and Humphrey as an unindicted coconspirator. Subsequent to the publication of the indictment, the State Department designated the ambassador *persona non grata* and asked his government to

---

**23.** When Congress adopted § 798 to protect classified communications information, Congress consciously refrained from enacting a criminal prohibition applicable to disclosures of other categories of classified information:

> This bill is an attempt to provide . . . legislation for only a small category of classified matter, a category which is both vital and vulnerable to an almost unique degree.
>
> . . . Under the bill as now drafted there is no penalty for publishing the contents of United States Government communications (except, of course, those which reveal information in the categories directly protected by the bill itself). Even the texts of coded Government messages can be published without penalty as far as this bill is concerned, whether released for such publication by due authority of a Government department or passed out without authority or against orders by personnel of a department. In the latter case, of course, the Government personnel involved might be subject to punishment by administrative action but not, it is noted, under the provisions of this bill.
>
> The bill, while carefully avoiding the infringement of civil liberties, extends the pro-tected field covered by the [predecessor of § 798] . . . .

Here, then, is another in a long series of conscious congressional decisions not to render criminal the mere unauthorized disclosure of all categories of classified information.

**24.** The government urges that the conviction be upheld on the theory that the defendants stole government property in the form of Humphrey's work time and xeroxing facilities when Humphrey copied the documents during working hours at the United States Information Agency. The Third Circuit in *United States v. DiGilio,* 538 F.2d 972 (1976), *cert. denied sub nom. Lupo v. United States,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977), recently upheld a conviction under § 641 based on this theory. In this case, however, the defendants were indicted based on the conversion of the information, not the theft of government xeroxing resources, and the judge's jury instructions likewise only dealt with conversion of information. Therefore, I think this rationale is unavailable to affirm the convictions and pass no judgment upon the validity of this method of proceeding under § 641.

recall him. The defendants advised the district court that they wished to speak with the ambassador and might call him as a witness. The government then agreed to a court order enjoining it for a period of ten days from taking action to expel the ambassador from the United States. Interpreting the order closely, the State Department, while it did not press its earlier request for recall, also did not rescind it. Soon thereafter, the ambassador left the United States pursuant to his government's instructions. The defendants claim that they were thus denied compulsory process. *See Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

Some courts have dismissed indictments when the government has deported illegal aliens who were potential witnesses in the prosecution of a defendant. *See, e. g., United States v. Calzada*, 579 F.2d 1358 (7 Cir. 1978); *United States v. Mendez-Rodriguez*, 450 F.2d 1 (9 Cir. 1971). Those courts have ruled that the government violated the defendant's right to compulsory process by placing potential witnesses beyond his reach and beyond the jurisdiction of the court. But we do not think these authorities applicable.

There are two critical distinctions between the deportation cases and this diplomatic recall case. First, in the case of a diplomatic recall, the State Department's interest in holding foreign diplomats to acceptable standards of conduct is much more compelling than the government's interest in deporting illegal aliens. When a foreign diplomat becomes engaged in outrageous and perhaps sinister conduct, such as participation in an illegal conspiracy, the United States government cannot decline to act. Thus, while the government's interest in deporting illegal aliens may be outweighed

by the defendant's right to compulsory process, the balance does not tip so clearly in the defendant's favor when the national government requests the recall of an errant representative of another nation.

Second, when a diplomat is the potential witness, he may well not testify even if he remains in the United States. Because of diplomatic immunity, the witness is not amenable to judicial process. The diplomat may testify only if his government waives his immunity. Therefore, even if the United States government forces a foreign representative to leave, the government may not have prejudiced the defendant, because the foreign nation might have refused to permit its representative to testify in a United States criminal prosecution if he had stayed. As a consequence, the defendant's claim of a denial of compulsory process is very attenuated when a foreign diplomat is the unavailable witness.

Because of the bar of diplomatic immunity and because of the national interest in taking action against diplomats who misbehave, we conclude that, in order to demonstrate a denial of compulsory process, the defendant must go further than to point to a missing diplomat/witness and government involvement in the diplomat's recall. *Accord, United States v. Butenko*, 384 F.2d 554, 567 (3 Cir. 1967) *vacated and remanded on other grounds*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

We therefore hold that in a case such as this one a defendant must show prejudice by demonstrating that the foreign government would have waived the diplomatic immunity of its representative.[25] Without such a showing, there is no reason to believe that the defendant was harmed by the potential witness' absence and there is like-

---

**25.** Importantly, there is no evidence in this case that the government acted in bad faith. While the State Department did not make every effort to prevent the ambassador from leaving the United States, the government fully complied with the limited terms of the court order issued by the district judge. As the district court ruled, the order only instructed the government to refrain from taking further affirmative action to expel the ambassador from the United States. Thus, the order did not require the government to withdraw its recall request, nor did it require the government to take other steps to convince the ambassador to remain in the United States. By failing to rescind its recall request, then, the State Department did not act in bad faith.

Moreover, there is no proof that the State Department made the recall request merely to deny the defense a favorable witness.

wise no reason to penalize the United States government for taking appropriate action against an errant diplomat. In this case, the defendants have failed to supply the necessary proof, and therefore there is no basis on which to conclude that the defendants were denied compulsory process.[26]

## VII.

The defendants make a variety of other objections to their convictions. None of these do we find meritorious.

### A. Statements of a Coconspirator

■ Krall testified that in April she delivered a package from Truong to Dong, president of the Vietnamese Association in Paris. Two persons arrived at Dong's headquarters; Dong told Krall that they were Vietnamese officials. Krall testified that the two unidentified officials told Dong, "I hope you get a package from America," and after Dong handed them the package, "What a perfect time for these government arrivals." The defendants object that these statements were inadmissible hearsay.

These statements, however, were made by coconspirators and thus fall within the coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E). The defendants rely on United States v. Stroupe, 538 F.2d 1063 (4 Cir. 1976), in support of their claim that the evidence was inadmissible. But in Stroupe, the out-of-court statement was ruled inadmissible because the only real evidence of conspiracy was provided by the

hearsay statement itself. Here, Krall's testimony, not merely the statements of the out-of-court declarant, provided evidence of the conspiracy. Therefore, under Fed.R. Evid. 801(d)(2)(E), the statements were admissible. See United States v. Jones, 542 F.2d 186, 203 (4 Cir.), cert. denied, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976).

### B. Admission of Truong's Library

■ Several items removed from Truong's apartment were admitted in evidence at trial. Truong had contended that his interest in the cables obtained from Humphrey was a benign scholarly preoccupation with Vietnam and Vietnamese-American relations. Found among Truong's books and papers were a State Department Telecommunications Handbook which included classification codes, parts of the State Department Biographical Register which were annotated by hand to indicate which of the employees were "spooks," pictures of Truong in the company of the Vietnamese ambassador who was an unindicted coconspirator, and handwritten notes on espionage and counter-espionage. These materials were undoubtedly relevant to determining the nature of Truong's interest in the materials Humphrey gave him, an issue put before the court by Truong himself. The district judge decided that the probative value of this evidence outweighed its possible prejudicial effect, Fed.R.Evid. 403, and we find no error in his determination.[27]

---

**26.** In addition, we note that the defendants have not argued that the government failed to cooperate with them in any efforts to secure the presence of the Vietnamese ambassador at trial. After the ambassador left the United States, the district judge extracted a pledge from the government that it would aid the defendants in an attempt to convince the Vietnamese government to allow the ambassador to appear at trial. Neither party has informed the court of the result of the defendants' entreaties to the Vietnamese government, if any were made, and we infer from this silence that the government did not violate its pledge.

**27.** The defendants make several other challenges to their convictions which deserve only brief mention.

Humphrey petitioned the court to permit him to take a lie detector test and admit the results into evidence. Those circuits which have allowed the admission of the results of unstipulated lie detector tests have granted the district judge great discretion in deciding whether to admit the test results. See, e. g., United States v. Mayes, 512 F.2d 637, 648 n.6 (6 Cir.), cert. denied, 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975). We need not pass on the admissibility of such test results, because we find that even if they were admissible, the district judge did not abuse his discretion by excluding them in this case.

During his rebuttal, the prosecutor argued that disclosures of secret information could harm the national defense even if they "wouldn't put Russians on Pennsylvania Avenue." Although the comment may have been overblown, it was

## VIII.

We affirm the defendants' convictions, subject to further proceedings on remand. Upon remand, the district court will examine the final group of documents produced by the prosecution for Jencks Act material and take such steps as are consistent with this opinion.

AFFIRMED.

DONALD RUSSELL, Circuit Judge, concurring and dissenting:

I wholeheartedly concur in Judge Winter's scholarly opinion herein in which he has carefully and perceptively canvassed the troublesome law of criminal espionage, except for its ruling on the count charging a violation of § 641, 18 U.S.C., as set forth in Part V of the opinion.

In the district court the defendants were convicted under the espionage counts in the indictment and each received a sentence of fifteen years. They also were convicted under three other counts, including the count under § 641. They received sentences of five years under each of these counts. All sentences were to run concurrently. The opinion of Judge Winter sustains all these convictions save that under § 641. His opinion would reverse the conviction under this count. It was, however, the position of the Government, as stated in its brief, and reiterated in oral argument, that "if this Court affirms appellants' convictions on any of those counts (that is, the counts other than that under § 641), there is no occasion for it to consider appellants'

contentions regarding their Section 641 convictions." In short, it declares that under the concurrent sentence rule, it is unnecessary in this case to review the conviction of the defendants under § 641. I agree.

The concurrent sentence rule provides that where a defendant receives concurrent sentences on plural counts of an indictment and where the conviction on one count is found to be good, a reviewing court need not pass on the validity of the defendant's conviction on another count. This familiar rule has been repeatedly approved by both the Supreme Court[1] and by this court.[2] In recent decisions—particularly because of the decision in *Benton v. Maryland* (1969) 395 U.S. 784, 791–92, 89 S.Ct. 2056, 2060–2061, 23 L.Ed.2d 707—the application of the rule has, though, been restricted to situations where there is no substantial possibility that the unreviewed conviction will adversely affect the defendant's right to parole or expose him to a substantial risk of adverse collateral consequences. *See United States v. Vasquez-Vasquez* (5th Cir. 1980) 609 F.2d 234, 235; *United States v. Rubin* (5th Cir. 1979) 591 F.2d 278, 280, cert. denied, 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87; *United States ex rel. Weems v. Follette* (2d Cir. 1969) 414 F.2d 417, 419, cert. denied, 397 U.S. 950, 90 S.Ct. 973, 25 L.Ed.2d 131 (1970). We recognized this limitation upon the rule in *Close v. United States* (4th Cir. 1971) 450 F.2d 152, 155, cert. denied, 405 U.S. 1068, 92 S.Ct. 1513, 31 L.Ed.2d 799 (1972).

not so inflammatory as to require reversal, particularly in light of the equally rhetorical argument of the defense and in light of the fact that the Soviet Union did not play a role in this case. The prosecutor also made comments in his rebuttal that might be interpreted as shifting the burden of proof in some areas to the defense. The district judge interrupted the prosecutor's rebuttal and corrected any misimpressions through corrective instructions, and, in addition, the district judge's final instructions included the usual burden of proof directives.

Finally, we reject the defendants' contentions that the indictment was insufficient and that the voir dire was inadequate.

1. *Barnes v. United States* (1973) 412 U.S. 837, 848, n.16, 93 S.Ct. 2357, 2364 n.16, 37 L.Ed.2d 380; *Lawn v. United States* (1958) 355 U.S. 339, 359, 78 S.Ct. 311, 322, 2 L.Ed.2d 321; *Roviaro v. United States* (1957) 353 U.S. 53, 59, n.6, 77 S.Ct. 623, 627 n.6, 1 L.Ed.2d 639; *Hirabayashi v. United States* (1943) 320 U.S. 81, 85, 63 S.Ct. 1375, 1378, 87 L.Ed. 1774.

2. *United States v. Powell* (4th Cir. 1969) 407 F.2d 582, 585, cert. denied, 395 U.S. 966, 89 S.Ct. 2113, 23 L.Ed.2d 753; *United States v. Wechsler* (4th Cir. 1968) 392 F.2d 344, 348, cert. denied, 392 U.S. 932, 88 S.Ct. 2283, 20 L.Ed.2d 1389; *United States v. Jacobs* (4th Cir. 1967) 386 F.2d 170, 172.

932

There is, though, no substantial likelihood of adverse effect on defendants' possible parole rights or of other adverse collateral consequences arising out of the failure to review the convictions under § 641 in this case. *See United States v. Smith* (8th Cir. 1979) 601 F.2d 972, 974–75, *cert. denied*, 444 U.S. 879, 100 S.Ct. 166, 62 L.Ed.2d 108. The conviction under the espionage charges resulted in a sentence of fifteen years. Under § 4205(a), 18 U.S.C., the defendants must serve at least five years under this sentence before they will become eligible for parole. The defendants, therefore, cannot be eligible for parole until they have served five years of their concurrent sentences. When, however, they have served that five years, they would have completed their concurrent sentences under the § 641 count. Neither is there any possible adverse effect on the defendants' place or conditions of confinement by reason of the application of the concurrent sentence rule in this case. *See United States v. Holder* (8th Cir. 1977) 560 F.2d 953, 956, n.4. Moreover, there could be no adverse effect under the Parole Commission's "salient factor score," since the guidelines for such "score" provide that multiple offenses arising out of a single set of circumstances (which is the situation here) will be treated as a single offense thereunder. *See United States v. Smith*, 601 F.2d at 975. Accordingly, allowing defendants' convictions under the § 641 count will not increase the time defendants will have to serve nor cause them any adverse collateral consequences. I, therefore, would apply the concurrent sentence doctrine in these cases, and decline to review the merits of the defendants' convictions under § 641. I find support for this view in the action taken by the court in *United States v. Boyce* (9th Cir. 1979) 594 F.2d 1246, 1252, also an espionage case, in which there was, as here, a concurrent sentence under a § 641 count which the court declined to review for the same reasons assigned by me for declining to review like convictions in these cases.

K. K. HALL, Circuit Judge, concurs in this opinion.